David M. Markowitz, New York City, for defendant Jean Claude LeFranc.

Netter, Lewy, Dowd, Fox, Ness & Stream, New York City, for defendant Jean Nebbia; Arnold C. Stream, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City; William Tendy, Otto Obermaier, Asst. U. S. Attys., of counsel.

Irving Younger, New York City, for defendant Samuel Desist.

Abraham M. Glasser, New York City, for defendants Frank Dioguardi and Anthony Sutera.

**UNITED STATES of America**

**v.**

**Samuel DESIST, Frank Dioguardi, Jean Claude LeFranc, Jean Nebbia and Anthony Sutera, Defendants.**

**No. 66 Cr. 7.**

United States District Court
S. D. New York.

Aug. 30, 1967.

PALMIERI, District Judge.

Preliminary Statement

This case, presently *sub judice* before the Court of Appeals after a trial com-

pleted before this Court on July 11, 1966, was remanded by order of that court dated May 29, 1967, "so that the trial judge may conduct a prompt and full hearing to ascertain the Government's use of electronic equipment on the occasions referred to on page 2 of the * * * letter from the United States Attorney" dated April 27, 1967, addressed to the Clerk of the Second Circuit.[1] The letter of the United States Attorney[2] refers to two instances of electronic eavesdropping: (1) One took place in Columbus, Georgia, on December 18, 1965 (the Avis car rental incident) and provided no evidence of any kind since the equipment malfunctioned, and (2) the second took place between April 25, 1962, and April 1, 1963, and consisted of an electronic listening device used in a business establishment in Miami, Florida (the Case Maria-Dorey surveillance). This will be discussed fully.

In its order the Court of Appeals directed that "at such hearing the district court will confine the evidence presented by both sides to that which is material to questions of the content of any electronically eavesdropped conversations overheard on those occasions, and of the relevance of any such conversations to petitioners' subsequent convictions". On June 14th the Court of Appeals handed down a supplementary order of which counsel were advised at a conference held on June 14th.[3] The order stated, in substance, that the defendants were to be allowed "to explore, in addition to the incidents described in the letter of April 27, 1967 to the Clerk from the United States Attorney, the question of whether any governmental personnel engaged in any other electronic eavesdropping of any other kind which related to this case. * * *"

At conferences between Court and counsel on June 19th and July 6th, defendants' counsel repeatedly urged that they be given additional time to complete their investigation and on a number of occasions requested the production of approximately 40 witnesses, many of them law enforcement officers of high echelon. After lengthy discussion with counsel, the Court requested the presence of the supervising agent in charge of the Miami, Florida, office of the Federal Bureau of Investigation and the narcotics agent in charge of the investigation of the case in the Atlanta-Columbus area. These witnesses, agents Swinney and Matuozzi, were called as a matter of caution, in order to complete the proof adduced by the Government with respect to the Casa Maria-Dorey surveillance and the Avis car rental incident. In both instances the evidence indicated that there was no relationship whatever between the incident and the proof adduced against the defendants in this case.

The Casa Maria-Dorey incident related to an investigation by the Federal Bureau of Investigation through its Miami office, which was totally unrelated to any of the evidence in the case. It developed that the defendant Dioguardi participated or appeared to have participated in some of the conversations which were overheard. However, nothing that was said by Dioguardi, and no reference made to him in any of these conversations, had any possible relationship to the evidence in this case. Clerks of the Federal Bureau of Investigation listened to tapes of these conversations and transcribed notes of them. The transcribed notes were quite voluminous and were marked in evidence at the hearing. (Government's exhibits 102 and 103.) However, only the relevant portions, that is, those portions relating to the defendant Dioguardi,

---

1. The order of the Court of Appeals is reproduced as an appendix hereto.

2. This letter, in full, is reproduced in the appendix hereto.

3. Conferences between Court and counsel were held on June 7, 1967, and again on June 14th, with a view to setting dates for the evidentiary hearings, settling questions of representation and arranging for the appearance of the defendants at the hearings.

were revealed to counsel. (Government's exhibit 103.) These were the portions which reported the conversations in which he participated or the conversations in which it was believed he was one of the speakers. The portions which were not revealed to counsel (Government's exhibits 100 and 102) were ordered sealed by the Court and have been preserved for appellate scrutiny.

These transcribed notes indicate that there was no relationship between the eavesdropping and the evidence in this case. Indeed they preceded the events to which this case related by approximately two years.

The Avis rental car episode took place in Columbus, Georgia, on December 18, 1965, shortly before the arrests of the defendants and the heroin seizure which led to the indictment in this case. On this occasion, an apparatus was installed in an automobile rented to the defendant Nebbia by the Avis car rental agency. Through this apparatus the narcotics agents engaged in surveillance of Nebbia hoped to overhear conversations between Nebbia and his co-conspirators. The apparatus did not function. It gave only static and unintelligible noises from which no evidence could be secured. In addition, it should be pointed out that the defendant Nebbia customarily spoke in French. The only French-speaking agent seeking to listen in on the conversations was Agent Kiere, who testified at length at the trial and also testified at the hearing before this Court on June 26, 1967. His testimony, as well as corroborating testimony by Agents Waters, Matuozzi and Selvaggi, provided clear and persuasive proof that the apparatus did not function and that nothing coherent was obtained.

The only other episode related to eavesdropping on conversations in the room occupied by the defendant Nebbia at the Waldorf-Astoria Hotel in New York City between December 14–18, 1965. This eavesdropping was much bruited at the trial and was fully explored by the defendants both at trial and at *in camera* hearings during the trial. This matter is the subject of review in the appellate proceedings and needs no elaboration here since this episode was not deemed to be within the purview of the broadened frame of reference as set forth in the order of the Court of Appeals of June 14, 1967. For these reasons the defendants were not permitted to re-explore the Waldorf-Astoria eavesdropping episode.

In sum, there is no persuasive evidence before this Court that defendants' rights were impinged upon in any way by any electronic eavesdropping activities of the government agents.

The defendants were given whatever time they requested to complete their investigation and a full opportunity to present evidence indicating a violation of their rights. Evidentiary hearings were held before the Court on June 26, July 11, July 18 and July 25. The government witnesses, whether called by the defense or produced by the Government on its own initiative, or at the Court's request, all proved to be accurate and reliable witnesses, and they supported in various ways the conclusion above stated.

Subsequent to the Court of Appeals' order of May 29, 1967, the defendants hired an investigator, one John G. (Steve) Broady. As a result of his efforts he interviewed and obtained as defense witnesses two men of advanced years, Mr. Charles B. Brown, former night manager of the Black Angus Motel at Columbus, Georgia, and Mr. Oscar H. Kennington, who is still employed as the day manager at the motel. They testified before this Court on July 18, 1967. Their testimony, construed in the light most favorable to the defendants, would indicate that part of the Government's proof in the principal case was derived from electronic eavesdropping, separate and apart from the Waldorf-Astoria surveillance; that there had been a search of defendant Desist's room by narcotics agents at the Black Angus motel; and that a telephone conversation

by Desist in a foreign language, presumably French, had been overheard at the motel switchboard by narcotics agent Waters.

The testimony of Brown and Kennington was seriously impugned by the Government as a matter of accuracy and several narcotics agents expressly contradicted its purport.

The written statements purported to have been given by Brown and Kennington to Broady (defendants' exhibits G and H for identification) were used to refresh their recollection and as a basis for impeachment. In a number of instances the written statements appeared to be more favorable to the defendants than the testimony which Messrs. Brown and Kennington gave at the hearings. These statements were not accepted by this Court as independent proof of any probative value apart from the testimony of the witnesses. (See conclusion of law No. 4.) Indeed the defendants in their brief before this Court come very close to questioning the credibility of these witnesses, saying that "the dispositive formulation of the credibility question at this time (as to Brown and Kennington) is not whether through their testimony the defendants have proved unconstitutional electronic eavesdropping, but whether a sufficiently probative indication thereof has been achieved to justify allowing the defendants a further opportunity for more or less plenary hearing." [4] This statement, standing alone is more pettifogging than persuasive.

■ The Court was frequently confronted by defense demands for procedures which would have amounted to a grandiose fishing expedition. Apparently unmindful of the burden resting upon the accused attacking the propriety of evidence to establish the fact that such evidence was illegally obtained (see conclusion of law No. 5), the defendants sought to make of the hearings a continuing exploration of massive breadth, a grand inquest. Had such exploration been pursued, it would have consumed a very considerable amount of time, to say nothing of the expense to the Government and the serious inconvenience to this Court and to many government agencies.

However, the Court did give both sides the fullest opportunity to present any evidence they wished.[5]

The Government's proof was forthright and persuasive and established beyond any possible doubt that the evidence against each of the defendants in this case was not tainted. The Assistant United States Attorney in charge of the trial, Mr. William Tendy, was called by the defendants and examined under oath. His testimony alone, coupled with the reasonable inferences to be drawn from it, establishes that no eavesdropping evidence of any kind was used against any defendant in the case, except the carefully examined Waldorf-Astoria surveillance of December, 1965, which is part of the trial record. The defendants have not sought to impugn Mr. Tendy's testimony. Further, it was forcefully corroborated by the twelve government witnesses who testified at the hearings. In the second *Nardone* case,[6] famous because of the "fruit of the poisonous tree" doctrine, Mr. Justice Frankfurter stated:

"The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wiretapping was unlawfully employed. . . . [and that] . . . claims that taint attaches to any portion of

---

4. Defendants' brief, p. 22.

5. Although the last evidentiary hearing took place on July 25, 1967, it became necessary to await the transcription of the minutes and the submission of the briefs before the matter could be deemed to be fully submitted. Despite the allowance of a schedule in accord with the defendants' wishes, and extensions of time apart from that schedule, the case was not, in fact, fully submitted until August 25, 1967.

6. Nardone v. United States, 308 U.S. 338, 341–342, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

the Government's case must satisfy the trial court with their solidity and not be merely a means of eliciting what is in the Government's possession before its submission to the jury."

Here, far from supporting their claims upon any solid basis, the defendants have put forward nothing better than conjecture or surmise, while the Government's proof is clear and persuasive that no portion of its case was tainted by any invasion of the defendants' constitutional rights.

The findings of fact and the conclusions of law which follow are set forth in amplification of what has already been said, and are intended to demonstrate that there were no eavesdropping incidents of any kind, other than those mentioned, and that none of them tainted the evidence against any of the defendants.

## FINDINGS OF FACT

### Casa Maria-Dorey Surveillance

1. From April 25, 1962 to April 1, 1963, an electronic eavesdropping device was maintained at a business establishment, known variously as the Casa Maria Restaurant or Dorey's and located at 150 Sunny Isle Boulevard, Dade County, Florida. The manner in which this surveillance came to the attention of the prosecuting officers in this case after the conclusion of the trial was as follows:

Pursuant to the review procedure initiated by the United States Department of Justice in Schipani v. United States (see finding of fact 19, infra), the Assistant Attorney General, Criminal Division, by memorandum dated January 12, 1967, requested the Director of the Federal Bureau of Investigation to ascertain the nature and extent of any electronic surveillance of any of the defendants in this case. This request was forwarded the same day to Special Agent J. Wayne Swinney of the Miami office of the Federal Bureau of Investigation, supervisor of the criminal intelligence program in the geographical jurisdiction of the Miami office and in charge of the electronic surveillance activities of that office. Agent Swinney was requested to ascertain whether any of the defendants were overheard on any electronic device in the Southern Judicial District of Florida. In response, Special Agent Swinney forwarded the complete logs of the Casa Maria-Dorey surveillance to the United States Department of Justice.

2. The Government conceded that the Casa Maria-Dorey surveillance was achieved by trespass.

3. The Casa Maria-Dorey electronic surveillance was not directed against any of the defendants in this case, nor did it lead in any way to any Federal law enforcement activity involving any of them. Its subject was one Ricci, an individual totally unrelated to this prosecution.

4. On the following dates in 1962, the defendant Frank Dioguardi was positively identified as a participant in the conversations or activities overheard by the Casa Maria-Dorey surveillance:

October 12 (GX 2)*
October 14 (GX 10)
October 30 (GX 11)
November 2 (GX 5)
November 4 (GX 12)
November 6 (GX 6)
November 7 (GX 7)
November 8 (GX 8)
November 30 (GX 9).

5. On several other occasions in 1962, the defendant Frank Dioguardi, although not positively identified, was thought to be a possible participant in the conversations or activities overheard by the Casa Maria-Dorey surveillance. These occasions were:

September 12 (GX 1)
October 26 (GX 3)
November 1 (GX 4).

---

* The prefix "GX" refers to the Government's Exhibits introduced at the hearings.

6. At no time were any of the other defendants participants in any conversations or activities overheard during the Casa Maria-Dorey surveillance.

7. Following regularly established office procedure, the conversations or activities overheard by the Casa Maria-Dorey surveillance on the dates specified in findings of fact 4 and 5 were monitored by clerks in the employ of the Federal Bureau of Investigation, in Miami, Florida. The clerks recorded the activities or conversations overheard on daily logs. The time of the occurrence, and the initials of the auditor were also recorded.

When the matter overheard did not appear pertinent, only handwritten notes were taken, and were summarized on the log sheets (e. g. the weather; the price of automobiles). Any uncertainty was to be resolved in favor of relevance. The summary would be based solely upon what was overheard and would not contain any other material.

Where relevant information was revealed the handwritten notes were supplemented by a tape recording of the conversation. Later the clerks would replay the tape, and, comparing it with the handwritten notes, would attempt to obtain a verbatim transcript of the conversation which would then be entered in the log. As soon as the log sheets were typed, the handwritten notes were destroyed pursuant to the regular procedure.

Any tapes resulting from the installation were retained for a period of seven days and then erased pursuant to the regularly established office procedure. None of the tapes resulting from the Casa Maria-Dorey installation were retained beyond a seven-day period and were all erased no later than April 8, 1963.

The logs comprise the most complete record kept by the Federal Bureau of Investigation of the conversations and activities overheard by the Casa Maria-Dorey installation.

8. All of the log sheets resulting from the Casa Maria-Dorey surveillance were produced for the Court's inspection and marked GX 100. The Court has examined all of the log sheets comprising GX 100 and finds that the only defendant overheard during the Casa Maria-Dorey surveillance was Frank Dioguardi, who was overheard only on the dates specified in findings of fact 4 and 5.

9. The complete log for each of these days was collated and collectively marked GX 102. The specific portion of each of the logs pertaining to Dioguardi were bracketed in ink on GX 102 and separately collated as GX 103.

(Copies of GX 103 [GX 103–A, –B, –C, –D] were furnished to defense counsel on June 21, 1967, five days prior to the taking of any testimony, as well as during the taking of testimony. In addition, GX 103 was later introduced as a Government Exhibit.)

After *in camera* examination, the Court finds that GX 103 truly comprises all those portions of GX 100 and 102 in which any defendant in this case was a participant or a possible participant. The Court ordered GX's 100 and 102 sealed for appellate review. There is no relevant connection between any of the remaining material and any of the defendants, this prosecution, or the issues of this hearing.

10. None of the conversations or activities recorded in GX 1 through 12, and GX 103, has any relevance to any of the evidence introduced at the trial or the subsequent conviction of any of the defendants.

11. No electronic surveillance of any kind [either by trespass or without trespass] other than that described in findings of fact 1 through 5, was conducted by personnel of the Miami office of the Federal Bureau of Investigation against any of the defendants in this case or which related to or affected this case.

12. At the time of the trial the office of the United States Attorney for the Southern District of New York had no knowledge of the Casa Maria-Dorey

surveillance nor of the contents of the logs.

### The Avis Car Rental Incident

13.   On December 18, 1965, in Columbus, Georgia, agents of the Federal Bureau of Narcotics installed an electronic listening device in a yellow Plymouth automobile owned by the Avis Rent-A-Car System.   Later that day the automobile was rented by the defendant Jean Nebbia.

14.   At various times the defendants Jean Nebbia, Jean Claude LeFranc and Samuel Desist were present in the automobile.

15.   The listening device malfunctioned, gave only static noise, and revealed no intelligible sounds.   Therefore no recordings were made, no notes were taken, and no reports were prepared.

16.   The use of the electronic listening device was totally abandoned during the early morning hours of December 19, 1965, when surveillance of the subjects was discontinued.   When visual surveillance was resumed later that morning by agents of the Federal Bureau of Narcotics it was undertaken in a different automobile.   The agents did not use or attempt to use any listening device in the new automobile.

17.   No electronic surveillance of any kind, except that described in findings of fact 13 through 16, and that conducted at the Waldorf-Astoria was conducted by agents of the Federal Bureau of Narcotics during the investigation of the crime charged in the indictment or which affected or related to the case.

18.   The office of the United States Attorney for the Southern District of New York had no knowledge of the installation of the device in the Avis Rent-A-Car automobile at the time of the trial.

### The Results of the Investigative Procedures Initiated by the *Schipani* Case Demonstrate the Absence of Tainted Evidence in this Case.

19.   Pursuant to the review procedure initiated by the United States Department of Justice, see Schipani v. United States, No. 504, Oct. Term 1966, Assistant Attorney General Vinson, in charge of the Criminal Division, requested by letter to David C. Acheson, Esq., the Special Assistant (for Enforcement) to the Secretary of the Treasury, that the following information be furnished regarding all pending prosecutions for violations of the Federal Narcotic Laws:

"(a) whether any of the individuals were subject to electronic surveillance by the investigating agency;

(b) if any were, did the electronic surveillance consist of wiretapping or an electronic eavesdropping device;

(c) if the latter, please advise us of the method of entry utilized in the placement of the device;

(d) when, by date, did the electronic eavesdropping take place and where did it occur, that is, at the individual's home, office, or other location;

(e) whether the named individuals appear to be present at, or participants in, conversations overheard by an electronic device which are reflected in any recordings, transcripts, logs, notes, memoranda, or other records of any such device;

(f) if so, and if such recordings, transcripts, logs, notes, memoranda and other records still exist, would you please make them available to us;

(g) did the information from any such device appear directly or indirectly in reports made in reference to the individuals by the agency.   If so, would you please advise us of the reports in which such information appeared and furnish us with copies of these reports if you have not already done so;

(h) if any information was obtained from electronic surveillance, to your knowledge was such information communicated in any manner to any other Federal agency;

(i) if so, to whom was the communication made, when was it made and

what is the nature of the information communicated." (GX 16)

The purpose of the Department of Justice inquiry was to determine "whether electronic surveillance was used in the investigation and, if so * * * the details of such surveillance." Mindful of the "heavy obligation resting upon us," Mr. Acheson made specific the breadth of the investigation in a communication to the Commissioner of Narcotics:

"It is essential that we provide the Department of Justice with reliable, accurate information, so that a reliable and accurate evaluation of the prosecution can be made by that Department. A corollary of this is that your Bureau's inquiry into the circumstances of each of these cases must be penetrating and must go back to the supervisors and agents familiar with the cases. In some cases evidence may have been turned over to your investigators by other Federal, state or local enforcement agencies, and in such case the inquiry must go to those sources of information."

In turn, the Commissioner of Narcotics made inquiry of each district office in the Federal Bureau of Narcotics as to the use of electronic surveillance equipment.

On December 30, 1966, John G. Evans, District Supervisor for District No. 6, whose geographical jurisdiction embraces both Altanta and Columbus, Georgia, informed Narcotics Commissioner Giordano of the following:

"1. On December 18, 1965, at Columbus, Georgia * * * a 'bugging' device was installed by narcotic agents on an Avis Rent-A-Car prior to its rental to Jean Nebbia and Samuel Desist after their arrival at Columbus, Georgia, from New York by plane. * * * No information was obtained, however, due to apparent malfunctions and static interference.

There were no other instances in this District in which 'bugging' equipment was used which involved trespass.

"2. There were no instances in this District during the period January 1963 to date in which 'bugging' equipment was used which did not involve trespass.

\* \* \* \* \* \*

"4. There were no instances in this District during the period January 1964 to date in which wire taps were placed, or participated in, by narcotic agents."

On January 19, 1967, Deputy Commissioner of Narcotics, George H. Gaffney, made a written report to Assistant Attorney General Fred M. Vinson, Jr., concerning the "electronic surveillance * * * used in the investigation of Jean Nebbia, Samuel Desist, et al. and * * the details of such surveillance." The report contained the following:

"(a) On two separate occasions, and at two different locations, electronic surveillance was employed during this investigation. In one instance, a device was used to record conversations in a hotel room, and in the other case, to monitor conversations in a rented automobile.

(b) In both instances, the electronic surveillance consisted of utilizing eavesdropping devices *and not wiretapping equipment.*

\* \* \* \* \* \*

(d) On the first occasion, on December 14, 1965, narcotic agents secured room 1602 of the Waldorf-Astoria Hotel, New York, which was adjoining room 1600 occupied by Jean Nebbia. A narcotic agent placed a Shure Brothers microphone (Model MC–115) at the bottom of the connecting door between rooms 1600 and 1602. The microphone was placed on the side of the door located in room 1602 occupied by the agents. No physical penetration was made into the room occupied by Jean Nebbia. This microphone was connected to a Concord tape recorder, and all sounds coming under the door from room 1600 were recorded.

In the other instance, on December 18, 1965, at Columbus, Georgia, after it

was learned that Jean Nebbia and Samuel Desist had made arrangements to rent an automobile from Avis Rent-A-Car, narcotic agents placed a radio transmitter in an Avis car, which was subsequently rented to Nebbia. No physical trespass was made into the car during the tenure of rental by Nebbia.

"(e) In the first instance, conversations by Jean Nebbia were monitored by a narcotic agent, recordings were made, and reports were prepared.

In the second instance, the radio device in the rented car did not function properly, no conversations were intelligible, and no recordings were made. Accordingly, no notes were taken, no recordings were made and no reports were prepared.

\*    \*    \*    \*    \*    \*

"(h) The information in the first instance was furnished to the United States Attorney. Since nothing was gained as a result of the second incident, no other Federal agency was advised of the attempted eavesdropping."

### Testimony of Activities at the Black Angus Motel

20. The Court finds the testimony of Agents Kiere, Benjamin, Waters, Matuozzi and Selvaggi to be forthright and persuasive. (Findings of fact 13–18.) It is neither damaged nor diluted by the testimony of Oscar Kennington and Charles B. Brown.

The Court has carefully appraised the testimony of these two defense witnesses, considering its nature and substance, its consistency and contradictions, the witnesses' age, demeanor and ability to recollect past events. Viewed most charitably, this testimony does not rise to the level of credible evidence.

A. *The Testimony of Oscar H. Kennington*

Oscar H. Kennington, a 60 year old former traveling salesman for headache powder and beer, was, in December, 1965, the day manager of the Black Angus Motel in Columbus, Georgia. His testimony concerning a purported overheard conversation on Monday, December 20, 1965, was marked by confusion, as he himself admitted, by an inability to accurately recall the events, the recurrent need to refresh his recollection, and by inconsistencies with his own prior written statement given only the day before.

Kennington testified that during the afternoon of Monday, December 20, 1965, he was invited to the agents' motel room to observe the seized narcotics, and "was thrilled over the stuff, I mean over putting my hand over all that much ——." He then described a conversation he purportedly had with a person in the room whom he was unable to identify. In response to Kennington's inquiry as to how the narcotics were smuggled into the United States, this unidentified person allegedly said: "It was brought in in a deep freeze, in the walls of a deep freezer, and on the way down from Atlanta, we kept in touch with him through conversation. \* \* \*" Apparently unsatisfied with the answer, counsel for the defendants attempted to refresh Kennington's recollection. In response, Kennington denied that anything was said about a radio transmitter in a car. When Kennington was shown his prior written statement given the day before to John G. (Steve) Broady, the defendants' investigator, he concluded, after considerable vacillation, by saying, "I assume it was a radio transmitter." When asked whether his prior written statement refreshed his recollection Kennington twice responded only that it was refreshed to the extent of the agents having said they followed them. He concluded with the statement: "Well, the only thing I could say that they said they got a lot of information following them around, and that is as definite as I can speak."[7] A portion of Kennington's prior statement which was inconsistent

---

7. P. 99, transcript of July 18, 1967.

with his testimony was then read into the record.

When Kennington resumed the stand after the luncheon recess, he stated that he wished to "change" one item of his earlier testimony. After giving several different versions of his prior testimony and the desired "change", he finally testified: "I heard them say they had a transmitter in the car, but now they were not talking to me directly, sir." This was in contradiction to his morning testimony specifically denying that the agents had stated they had a transmitter in the car. When questioned by the Court, Kennington testified that he specifically heard mention of the word radio transmitter and attempted to explain the inconsistency by stating, "Well, I am a little confused, sir."

The accuracy and truthfulness of Kennington's testimony are further clouded by his testimony on both direct and cross-examination that he saw Desist and checked him out of the motel on Monday, December 20. This was a physical impossibility since Desist was observed taking a Pan American flight for Paris, France, at 9:50 p.m. the previous evening, Sunday, December 19, at Kennedy International Airport in New York.

### B. The Testimony of Charles B. Brown

Similar inaccuracies and confusion characterized the testimony of Charles B. Brown. Brown, a 66 year old, former tugboat and steamboat captain, was the night manager of the Black Angus Motel in December, 1965.

A portion of Brown's testimony related to an incident in December, 1965, when he attempted to permit the narcotic agents to overhear on an extension a telephone call Desist received while at the Black Angus. Brown initially testified the incident occurred on Sunday evening, December 19, after he came on duty at 7:00 p.m. On cross-examination he fixed the time as between 7:00 and 9:30 p.m., Sunday evening, December 19. On further cross-examination he retracted his prior testimony and testified that this telephone incident occurred on Sunday morning, December 19. When questioned by the Court, he admitted that he could not recall when the incident took place. However, after being shown his prior written statement, a portion of which was read into the record, he testified in conformity with it that the incident occurred on Sunday evening at 8 o'clock.

In addition to Brown's confusion as to date, it is clear that Agent Waters did not overhear any portion of the conversation. Brown testified that the conversation had ended when he handed the receiver to the agent and that the agent held the receiver only a "few short seconds." He further testified that the conversation was in French. Agent Waters testified that he did not speak French.

Brown further testified that on Saturday, December 18, 1965, he gave Agent Waters the key to Desist's motel room. Although unable to observe the door of Desist's room, Brown testified that he observed the agents go and return to the building which contained it. Brown stated that the agents returned in "a minute and a half or two minutes" and told him only that "he is the man." Brown then twice denied that the agents had told him that they had examined Desist's room. Even after counsel attempted to refresh his recollection, Brown continued to deny that the agents had said anything about examining the contents of the room. It was only after Brown examined his prior written statement that he answered "yes" to a leading question as to whether the agents had said "they had examined the contents of the room."

Both Agents Waters and Selvaggi, when subpoenaed and questioned by defense counsel, denied having ever entered Desist's motel room. In view of Brown's inability to observe the agent enter the room, and the unreliable nature of his testimony, the Court credits the testimony of Agents Waters and Selvaggi, as

well as Matuozzi, and finds that at no time did the agents of the Federal Bureau of Narcotics enter Desist's motel room.

Nor does Brown's vague testimony that while occupied with other duties, he overheard a conversation that the agents "could hear from one car to the other" support any finding contrary to those set forth above.

The credibility of Brown's testimony is open to further question in view of the following facts. Brown initially refused to come to New York to testify at the trial at the request of the Government, stating: "I would not come to New York because I had been there as much as I ever cared to go."[8] Notwithstanding this reluctance, he did come to New York to testify before this Court. Although Brown claimed that the defendants told him nothing about the hearing, he explained that he was ultimately persuaded to appear because he was told "I should come as an American citizen and tell the truth." The defendants did, however, pay Brown's plane fare, hotel bills, meals, and his daily earnings which he claimed to be $50 per day as a self-employed insurance salesman for his 4-day stay in New York.

The unreliable nature of the testimony of the witnesses Kennington and Brown is in sharp contrast to the clear and unequivocal testimony of Agents Kiere, Benjamin, Matuozzi and Selvaggi, all of whom are law enforcement officers of long experience and standing. Upon the Court's assessment of the entire testimony, it credits the testimony of the agents and rejects that of Kennington and Brown.

## CONCLUSIONS OF LAW

1. Pursuant to the mandates of the United States Court of Appeals, dated May 29 and June 14, 1967, this Court has held hearings on the issues set forth therein. Defendants were afforded a full and complete opportunity to present their evidence, with the way prepared by four conferences before and during the hearings, defendants' burden lightened by numerous adjournments, their rights protected by the Government's production of twelve requested witnesses—in sum, a record spanning two months, comprising 813 pages of transcript.

2. The Court has analyzed the contents of the conversations relating to the defendant Frank Dioguardi overheard by the Casa Maria-Dorey surveillance (GX 1–12) and determined that they had no relevance to any of the evidence introduced at the trial or the conviction of any of the defendants.

3. Since nothing was overheard on the electronic device in the rented Avis automobile, it had no relevance to any of the evidence introduced at the trial or to the conviction of any of the defendants. The mere fact that an unsuccessful installation was made is not determinative.

■ 4. The written statements of Oscar Kennington and Charles Brown prepared by defendants' investigator John G. (Steve) Broady prior to the hearings were not given any independent probative value apart from the witnesses' sworn testimony at the post-trial hearing. United States v. Allied Stevedoring Corp., 241 F.2d 925, 933 (2d Cir. 1957). The decision of the Second Circuit in United States v. De Sisto, 329 F.2d 929 (1964) does not require a contrary conclusion.

■ 5. The defendants have failed to carry their burden of showing that any governmental personnel engaged in any other electronic eavesdropping related to this case. The defendants have failed to demonstrate that any of the evidence used against them at the trial was tainted by any invasion of their constitutional rights. Nardone v. United States, 308 U.S. 338, 341–342, 60 S.Ct. 266, 84 L.Ed. 307 (1939); United States v. Morin, 378 F.2d 472 (2d Cir., June 1, 1967); Addison v. United States, 317 F. 2d 808, 812 (5th Cir. 1963), cert. denied, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d

8. P. 47, transcript of July 18, 1967.

605 (1964); United States v. Coplon, 185 F.2d 629, 636 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952); United States v. Goldstein, 120 F.2d 485, 488 (2d Cir. 1942), aff'd 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942).

Both the Second Circuit and the Supreme Court ruled in Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed. 2d 321 (1958), United States v. Giglio, 232 F.2d 589, 594 (2d Cir. 1956), affirming 16 F.R.D. 268 (S.D.N.Y.1954) (where there had been an admitted invasion of the defendant's rights by way of violating the privilege against self-incrimination, which resulted in dismissal of a first indictment) that hearings were not necessary and that the affidavits of various government officials were of sufficient solidity to permit a ruling that the evidence actually used against the defendant was untainted.

6. There was no relation between the Government's use of electronic equipment as described in findings of fact 1 through 19 and the trial and conviction of any of the defendants. Other than the incidents referred to therein, there was no electronic eavesdropping of any kind, by any member of any governmental agency which in any way related to these defendants.

7. The defendants have established no valid reason for a continuance of the hearings before this Court.

APPENDIX

# United States Court of Appeals

SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals, in and for the Second Circuit, held at the United States Court House, in the City of New York, on the 29th day of May, one thousand nine hundred and 67.

Present:

HONORABLE HAROLD R. MEDINA
HONORABLE ROBERT P. ANDERSON
HONORABLE WILFRED FEINBERG

*Circuit Judges.*

UNITED STATES OF AMERICA,
Appellee,

-against-

SAMUEL DESIST, FRANK DIOGUARDI, JEAN CLAUDE LeFRANC, JEAN NEBBIA and ANTHONY SUTERA,
Appellants.

Upon consideration of the letter of April 27, 1967, to the Clerk from the United States Attorney, and the letter of May 1, 1967, to the Clerk from counsel to appellants,

IT IS HEREBY ORDERED that the case be remanded to the district court so that the trial judge may conduct a prompt and full hear-

ing to ascertain the Government's use of electronic equipment on the occasions referred to on page 2 of the above-mentioned letter from the United States Attorney, the effect, if any, of such use on the trial and conviction of appellants or any of them, and whether or not a new trial should be granted. At such hearing the district court will confine the evidence presented by both sides to that which is material to questions of the content of any electronically eavesdropped conversations overheard on those occasions, and of the relevance of any such conversations to petitioners' subsequent convictions;

IT IS FURTHER ORDERED that the district court judge make such findings of fact and conclusions of law, as may be appropriate in light of the further evidence and of the entire existing record, and report to this court, which retains jurisdiction of the appeal;

IT IS FURTHER ORDERED that such report and any other matters in connection with this appeal be referred to the panel that heard argument of this case on January 19, 1967.

> HAROLD R. MEDINA
>
> ROBERT P. ANDERSON
>
> WILFRED FEINBERG
>
> U.S.C. JJ.

United States v. Samuel Desist, et al.—Docket No. 30849

Referring to the prayer for relief contained on page 10 of the within motion, it is ordered that No. (1) be granted to the extent of allowing appellants to explore, in addition to the incidents described in the letter of April 27, 1967 to the Clerk from the United States Attorney, the question of whether any governmental personnel engaged in any other electronic eavesdropping of any other kind which related to this case, except that prayer for relief No. (2) is denied and the motion is in all other respects denied.

The prior order of May 29, 1967 is hereby amended as above stated.

> /s/  Harold R. Medina
>
> /s/  Robert P. Anderson
>
> /s/  Wilfred Feinberg
>
> U.S.C. JJ.

June 14, 1967

RMM
40711

April 27, 1967

A. Daniel Fusaro

Clerk

United States Court of Appeals

Second Circuit

United States Courthouse

Foley Square

New York, New York 10007

Re: U.S.A. v. Samuel Desist, et. al.
Docket No. 30849

Dear Mr. Fusaro:

I am in receipt of your letter of April 18, 1967 regarding the above matter.

In Granello v. United States [386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed. 2d 458], No. 750, this Term, cert. denied, April 24, 1967, the Department of Justice stated to the Supreme Court, in its brief at p. 19, n. 12 in opposition to the petitions for certiorari (copies of which are enclosed for the panel), that it believes its duty to disclose turns on whether something that is arguably material has been discovered. However, in view of the court's specific question, please advise the panel of the following: 1) there was no trespass committed in the monitoring litigated at the trial and at issue on appeal; 2) the review undertaken by the Department of Justice in this case pursuant to the policy enunciated in the Schipani Memorandum revealed two additional instances of electronic monitoring.

a) On December 18, 1965, in Columbus, Georgia, agents of the Bureau of Narcotics installed an electronic listening device in an automobile prior to its rental by Jean Nebbia. The device did not work and no conversations were overheard or recorded. This office was not aware of the installation of this device at the time of the trial below.

b) Between April 25, 1962 and April 1, 1963 agents of the Federal Bureau of Investigation installed, by trespass, an electronic listening device in the business establishment in Miami, Florida of an individual having no connection with the instant case. In 1962, two and a half years before the inception of the conspiracy, defendant Frank Dioguardi was overheard as a participant in two conversations at said establishment. Logs reflecting the content of these conversations are available and show that none of the conversations related in any manner to this case. Neither the existence of the surveillance nor any information overheard was communicated to the Bureau of Narcotics or to Government counsel who prosecuted the case.

I also enclose three copies of the material you requested for the panel.

Very truly yours,

ROBERT M. MORGENTHAU
United States Attorney