## DESIST ET AL. *v.* UNITED STATES.

No. 12. Argued November 12, 1968.—Decided March 24, 1969.

*Abraham Glasser* argued the cause for petitioners. With him on the briefs were *David M. Markowitz* and *Irving Younger.*

*Francis X. Beytagh, Jr.,* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Vinson, Beatrice Rosenberg, Ronald L. Gainer,* and *Roger A. Pauley.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioners were convicted by a jury in the District Court for the Southern District of New York of conspiring to import and conceal heroin in violation of the federal narcotics laws.[1] An important part of the Gov-

---

[1] 35 Stat. 614, as amended, 21 U. S. C. § 173 provides in pertinent part:

"It is unlawful to import or bring any narcotic drug into the United States or any territory under its control or jurisdiction . . . ."

21 U. S. C. § 174 provides in pertinent part:

"Whoever fraudulently or knowingly imports or brings any nar-

ernment's evidence consisted of tape recordings of conversations among several of the petitioners in a New York City hotel room. The tapes were made by federal officers in the adjoining room by means of an electronic recording device which did not physically intrude into the petitioners' room.[2] Because there was no "trespass" or "actual intrusion into a constitutionally protected

cotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000."

[2] The room occupied by the petitioners was separated from that of the agents by two doors with a small air space between them. According to the testimony of the federal agents—which was properly credited by both courts below after an exhaustive hearing that included an actual reconstruction of the equipment in the hotel room—the microphone was taped to the door on their side. The face of the microphone was turned toward the $3/8$-inch space between the door and the sill, and a towel was placed over the microphone and along the bottom of the door in order to minimize interference from sounds in the agents' room. A cable was run from the microphone to an amplifier and tape recorder in the bathroom adjoining the agents' room.

Petitioners contend that this installation was equivalent to a physical penetration of the petitioners' room because the airspace between the doors acted as a sound chamber, thereby facilitating the pickup of the conversations next door. We are unable, however, to distinguish this eavesdropping from that condoned in *Goldman* v. *United States*, 316 U. S. 129, where the agents simply placed a sensitive receiver against the partition wall. Petitioners' reliance on *Silverman* v. *United States*, 365 U. S. 505, is misplaced. The heating duct system used as a sound conductor by the agents in that case was "an integral part of the premises occupied by the petitioners," 365 U. S., at 511, and the agents had to penetrate the petitioners' house with a "spike microphone" before the heating duct could be thus employed.

246

area," the District Court and the Court of Appeals rejected the petitioners' argument that this evidence was inadmissible because the eavesdropping had violated their rights under the Fourth Amendment. The convictions were affirmed,[3] and we granted certiorari to consider the constitutional questions thus presented.[4]

Last Term in *Katz* v. *United States,* 389 U. S. 347, we held that the reach of the Fourth Amendment "cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Id.,* at 353. Noting that the "Fourth Amendment protects people, not places," *id.,* at 351, we overruled cases holding that a search and seizure of speech requires some trespass or actual penetration of a particular enclosure. We concluded that since every electronic eavesdropping upon private conversations is a search or seizure, it can comply with constitutional standards only when authorized by a neutral magistrate upon a showing of probable cause and under precise limitations and appropriate safeguards. The eavesdropping in this case was not carried out pursuant to such a warrant, and the convictions must therefore be reversed if *Katz* is to be applied to electronic surveillance conducted before the date of that decision. We have concluded, however, that to the extent *Katz* departed from previous holdings of this Court, it should be given wholly prospective application. Accordingly, and because we find no merit in any of the petitioners' other challenges to their convictions, we affirm the judgment before us.[5]

---

[3] 384 F. 2d 889.

[4] 390 U. S. 943.

[5] The only other issues which warrant mention relate to the Government's disclosure to the Court of Appeals of two instances of admittedly trespassory electronic surveillance affecting the petitioners. The Court of Appeals remanded the case to the District Court for a full evidentiary hearing on the subject matter of the disclosures. The first monitoring episode occurred during 1962–1963,

We are met at the outset with the petitioners' contention that *Katz* does not actually present a choice between prospective or retroactive application of new constitutional doctrine. The Court in that decision, it is said, did not depart from any existing interpretation of the Constitution, but merely confirmed the previous demise of obsolete decisions enunciating the distinction between "trespassory" searches and those in which there was no physical penetration of the protected premises. *Goldman* v. *United States,* 316 U. S. 129; *Olmstead* v. *United States,* 277 U. S. 438.[6] But this contention misconstrues our opinion in *Katz.* Our holding there that *Goldman*

---

when a device was installed in a Florida restaurant. The surveillance was directed at the owner of the restaurant rather than at any of the petitioners, but petitioner Dioguardi was overheard talking about the operations of the restaurant. The log sheets covering the entire period of surveillance were turned over to the District Judge for *in camera* inspection, and those relating to any conversations of Dioguardi were furnished to the defense. The second instance was an attempted bugging of a rented car used by petitioners Nebbia, Desist, and LeFranc in furtherance of the conspiracy. Again all records pertaining to this episode were turned over to the defense.

District Judge Palmieri, after holding an extensive hearing at which the petitioners were granted unrestrained opportunity to introduce evidence and cross-examine witnesses, concluded that none of the "evidence used against [the petitioners] at the trial was tainted by any invasion of their constitutional rights." 277 F. Supp. 690, 700. Judge Palmieri found that the Dioguardi conversations overheard in 1962–1963 were totally unrelated to the events of the conspiracy, which transpired over two years later. With regard to the second instance, he found that the device in-installed in the rented car "did not function and that nothing coherent was obtained." *Id.,* at 692. The Court of Appeals held that these findings were supported by the evidence and that the petitioners were accorded all the procedural rights to which they were entitled. We agree. See *Alderman* v. *United States, ante,* p. 165.

[6] See also *On Lee* v. *United States,* 343 U. S. 747.

and *Olmstead* "can no longer be regarded as controlling," 389 U. S., at 353, recognized that those decisions had not been overruled until that day.[7] True, the principles they expressed had been modified. The belief that an oral conversation could not be the object of a "search" or "seizure" had not survived.[8] And in *Silverman* v. *United States,* 365 U. S. 505, we had cautioned that the scope of the Fourth Amendment could not be ascertained by resort to the "ancient niceties of tort or real property law." 365 U. S., at 511. But the assumption persisted that electronic surveillance did not offend the Constitution unless there was an "actual intrusion into a constitutionally protected area." [9] While decisions before *Katz* may have reflected growing dissatisfaction with the traditional tests of the constitutional validity of electronic surveillance,[10] the Court consistently reiterated those tests and declined invitations to abandon them.[11] However clearly our holding in *Katz* may have been foreshadowed, it was a clear break with the past, and we are thus compelled to decide whether its application should be limited to the future.

Ever since *Linkletter* v. *Walker,* 381 U. S. 618, 629, established that "the Constitution neither prohibits nor requires retrospective effect" for decisions expounding

---

[7] See also 389 U. S., at 362 (HARLAN, J., concurring); 389 U. S., at 367, 372 (BLACK, J., dissenting).

[8] See, *e. g., Wong Sun* v. *United States,* 371 U. S. 471, 485; *Lanza* v. *New York,* 370 U. S. 139, 142; *Silverman.* v. *United States,* 365 U. S. 505; *Irvine* v. *California,* 347 U. S. 128.

[9] *Silverman* v. *United States, supra,* at 512.

[10] In *Katz,* 389 U. S., at 353, for example, we referred to our previous observation in *Warden* v. *Hayden,* 387 U. S. 294, 304, that "[t]he premise that property interests control the right of the Government to search and seize has been discredited."

[11] See *Berger* v. *New York,* 388 U. S. 41, 44, 50–53, 64; *Clinton* v. *Virginia,* 377 U. S. 158; *Lopez* v. *United States,* 373 U. S. 427, 437–439; *Silverman* v. *United States, supra,* at 510–512.

new constitutional rules affecting criminal trials, the Court has viewed the retroactivity or nonretroactivity of such decisions as a function of three considerations. As we most recently summarized them in *Stovall* v. *Denno,* 388 U. S. 293, 297,

> "The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." [12]

Foremost among these factors is the purpose to be served by the new constitutional rule.[13] This criterion strongly supports prospectivity for a decision amplifying the evidentiary exclusionary rule. Thus, it was principally the Court's assessment of the purpose of *Mapp* v. *Ohio,* 367 U. S. 643, which led it in *Linkletter* to deny those finally convicted the benefit of *Mapp*'s extension of the exclusionary rule to the States:

> "all of the cases . . . requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police action. . . . We cannot say that this purpose would be advanced by making the rule retrospective. The misconduct of the police . . . has already occurred and will not be corrected by releasing the prisoners involved." 381 U. S., at 636–637.[14]

---

[12] See also *DeStefano* v. *Woods,* 392 U. S. 631; *Johnson* v. *New Jersey,* 384 U. S. 719, 727; *Tehan* v. *Shott,* 382 U. S. 406, 413; *Linkletter* v. *Walker,* 381 U. S. 618, 629.

[13] See *Roberts* v. *Russell,* 392 U. S. 293, 295; *Witherspoon* v. *Illinois,* 391 U. S. 510, 523, n. 22.

[14] In other areas where retroactivity has been denied the "purpose" criterion offered much weaker support. Cf. *Stovall* v. *Denno,* 388 U. S. 293, 298, where it was conceded that "the *Wade* and *Gilbert* rules also are aimed at avoiding unfairness at the trial

We further observed that, in contrast with decisions which had been accorded retroactive effect,[15] "there is no likelihood of unreliability or coercion present in a search-and-seizure case"; the exclusionary rule is but a "procedural weapon that has no bearing on guilt," and "the fairness of the trial is not under attack." 381 U. S., at 638, 639. Following this reasoning of *Linkletter,* we recently held in *Fuller* v. *Alaska,* 393 U. S. 80, that the exclusionary rule of *Lee* v. *Florida,* 392 U. S. 378, should be accorded only prospective application. Analogizing *Lee* to *Mapp,* we concluded that evidence seized in violation of § 605 of the Federal Communications Act[16] was "no less relevant and reliable than that seized in violation of the Fourth Amendment," and that both decisions were merely "designed to enforce the federal law." 393 U. S., at 81.

The second and third factors—reliance of law enforcement officials, and the burden on the administration of justice that would flow from a retroactive application— also militate in favor of applying *Katz* prospectively. *Katz* for the first time explicitly overruled the "physical penetration" and "trespass" tests enunciated in earlier decisions of this Court. Our periodic restatements of those tests confirmed the interpretation that police and courts alike had placed on the controlling precedents and

by enhancing the reliability of the fact-finding process in the area of identification evidence"; *Johnson* v. *New Jersey,* 384 U. S. 719, 730, where it was recognized that *"Escobedo* and *Miranda* guard against the possibility of unreliable statements in every instance of in-custody interrogation"; and *Tehan* v. *Shott,* 382 U. S. 406, 414, where it was stated that "the 'purpose' of the *Griffin* rule is to be found in the whole complex of values that the privilege against self-incrimination itself represents," including "our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.'" *Id.,* at 414–415, n. 12.

[15] *Jackson* v. *Denno,* 378 U. S. 368; *Gideon* v. *Wainwright,* 372 U. S. 335; *Griffin* v. *Illinois,* 351 U. S. 12.

[16] 48 Stat. 1103, 47 U. S. C. § 605.

fully justified reliance on their continuing validity. Nor had other courts theretofore held that the prohibitions of the Fourth Amendment encompassed "non-trespassory" electronic surveillance. On the contrary, only a few months before the eavesdropping in this case, the Court of Appeals for the Second Circuit had upheld the introduction of electronic evidence obtained by the same narcotics agent with a virtually identical installation. *United States* v. *Pardo-Bolland,* 348 F. 2d 316, cert. denied, 382 U. S. 944.

Although there apparently have not been many federal convictions based on evidence gathered by warrantless electronic surveillance,[17] we have no cause to doubt that the number of state convictions obtained in reliance on pre-*Katz* decisions is substantial.[18] Moreover, the determination of whether a particular instance of eavesdropping led to the introduction of tainted evidence at trial would in most cases be a difficult and time-consuming task, which, particularly when attempted long after the event, would impose a weighty burden on any court. Cf. *Alderman* v. *United States, ante,* at 180–185. It is to be noted also that we have relied heavily on the factors of the extent of reliance and consequent burden on the administration of justice only when the purpose of the rule in question did not clearly favor either retroactivity or prospectivity.[19] Because the deterrent purpose of *Katz* overwhelmingly supports nonretroactivity, we

---

[17] The Government has informed us in its brief that "[i]nstead of a wholesale release of thousands of convicted felons, only a relatively small number would probably be affected [by a retroactive application of *Katz*], since electronic surveillance has played a part in a limited number of federal cases."

[18] We noted in *Berger* v. *New York,* 388 U. S. 41, 48–49, that only a handful of States have prohibited or regulated electronic surveillance by law enforcement officials.

[19] See *DeStefano* v. *Woods,* 392 U.S. 631; *Stovall* v. *Denno,* 388 U. S. 293; *Johnson* v. *New Jersey,* 384 U. S. 719. Cf. cases cited in n. 13, *supra.*

would reach that result even if relatively few convictions would be set aside by its retroactive application.

The petitioners argue that even if *Katz* is not given fully retrospective effect, at least it should govern those cases which, like the petitioners', were pending on direct review when *Katz* was decided. Petitioners point out that in *Linkletter,* the only other case involving the retroactivity of a Fourth Amendment decision, the Court held *Mapp* applicable to every case still pending on direct review on the date of that decision. A similar approach was adopted in *Tehan* v. *Shott,* 382 U. S. 406, with respect to the prospectivity of *Griffin* v. *California,* 380 U. S. 609. In *Johnson* v. *New Jersey,* 384 U. S. 719, however, we abandoned the approach taken in *Linkletter* and *Tehan* and concluded that "there are no jurisprudential or constitutional obstacles" to the adoption of a different cut-off point. *Id.,* at 733. We explained that

> "[o]ur holdings in *Linkletter* and *Tehan* were necessarily limited to convictions which had become final by the time *Mapp* and *Griffin* were rendered. Decisions prior to *Linkletter* and *Tehan* had already established without discussion that *Mapp* and *Griffin* applied to cases still on direct appeal at the time they were announced." *Id.,* at 732.[20]

[20] In *Linkletter* itself the Court noted that it dealt only with the narrow issue whether *Mapp* should be applied to final as well as nonfinal convictions:

"[*Mapp*] has also been applied to cases still pending on direct review at the time it was rendered. Therefore, in this case, we are concerned only with whether the exclusionary principle enunciated in *Mapp* applies to state court convictions which had become final before rendition of our opinion." 381 U. S., at 622.

*Mapp* had already been applied in *Ker* v. *California,* 374 U. S. 23; *Fahy* v. *Connecticut,* 375 U. S. 85; *Stoner* v. *California,* 376 U. S. 483. *Griffin* had been applied in *O'Connor* v. *Ohio,* 382 U. S. 286, shortly before *Tehan* was decided.

Here, on the other hand, as in *Johnson,* "the possibility of applying [*Katz*] only prospectively is yet an open issue." *Ibid.*

All of the reasons for making *Katz* retroactive also undercut any distinction between final convictions and those still pending on review. Both the deterrent purpose of the exclusionary rule and the reliance of law enforcement officers focus upon the time of the search, not any subsequent point in the prosecution, as the relevant date. Exclusion of electronic eavesdropping evidence seized before *Katz* would increase the burden on the administration of justice, would overturn convictions based on fair reliance upon pre-*Katz* decisions, and would not serve to deter similar searches and seizures in the future.

Nor can it sensibly be maintained that the Court is foreclosed by *Linkletter* in this case, as it was not in *Johnson,* simply because *Katz,* like *Mapp,* was a Fourth Amendment decision.[21] In neither *Linkletter* nor *Johnson* was it intimated that the cut-off points there adopted depended in any degree on the constitutional provision involved. There is, moreover, a significant distinction between the *Mapp* and *Katz* decisions. *Mapp* dealt solely with the applicability of the exclusionary rule to the States; "the situation before *Mapp* . . . [was that] the States at least knew that they were constitutionally forbidden from engaging in unreasonable searches and seizures under *Wolf* v. *Colorado,* 338 U. S. 25 (1949)." [22] Before *Katz* on the other hand, "non-trespassory" electronic surveillance was not thought to fall within the

---

[21] Actually, *Mapp* was, of course, decided under the Fourth and Fourteenth Amendments, with one member of the five-man majority relying at least in part on the Fifth Amendment. 367 U. S., at 661–666 (BLACK, J., concurring).

[22] *Johnson* v. *New Jersey,* 384 U. S. 719, 731. And see *Tehan* v. *Shott,* 382 U. S. 406, 417.

254

reach of the Fourth Amendment.[23] Therefore, this case lacks whatever impetus the *knowingly* unconstitutional conduct by the States may have provided in *Linkletter* to apply *Mapp* to all pending prosecutions.

In sum, we hold that *Katz* is to be applied only to cases in which the prosecution seeks to introduce the fruits of electronic surveillance conducted after December 18, 1967.[24] Since the eavesdropping in this case occurred before that date and was consistent with pre-*Katz* decisions of this Court, the convictions must be

*Affirmed.*

MR. JUSTICE BLACK, while adhering to his dissent in *Linkletter* v. *Walker,* 381 U. S. 618, 640 (1965), concurs in the affirmance of the judgment of convictions in this case for the reasons stated in his dissenting opinion in *Katz* v. *United States,* 389 U. S. 347, 364 (1967).

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[23] Indeed, since the Fourth Amendment prohibits only *unreasonable* searches and seizures, it could be argued that there was, in fact, no Fourth Amendment violation in the present case. The law enforcement officers could certainly be said to have been acting "reasonably" in measuring their conduct by the relevant Fourth Amendment decisions of this Court. Cf. *Katz* v. *United States,* 389 U. S. 347, 356; *James* v. *United States,* 366 U. S. 213, 221–222, 245.

[24] The dissenting opinion of MR. JUSTICE FORTAS suggests that our holding today denies "the benefit of a fundamental constitutional provision, and not merely of court-made rules implementing a constitutional mandate." *Post,* at 271. To the contrary, we simply decline to extend the court-made exclusionary rule to cases in which its deterrent purpose would not be served. The exclusionary rule "has no bearing on guilt" or "the fairness of the trial." *Linkletter* v. *Walker,* 381 U. S., at 638, 639.

Of course, Katz himself benefited from the new principle announced on that date, and, as our Brother DOUGLAS observes, to that extent the decision has not technically been given wholly prospective application. But, as we recently explained in *Stovall*

MR. JUSTICE DOUGLAS, dissenting.

It is a mystery to me why *Katz* v. *United States,* 389 U. S. 347, which was given retroactive effect to petitioner Katz will not be given retroactive effect to petitioner Desist and his copetitioners. That does not seem to me to be the administration of justice with an even hand. I would understand today's ruling if in *Katz* we had announced a new constitutional search-and-seizure rule to be applied prospectively in all cases. But we did not do that; nor did we do it in other recent cases announcing variations of old constitutional doctrine. The most notorious example is *Miranda* v. *Arizona,* 384 U. S. 436, where, as I recall, some 80 cases were presented raising the same question. We took four of them and held the rest and then disposed of each of the four, applying the new procedural rule retroactively. But as respects the rest of the pending cases we denied any relief. *Johnson* v. *New Jersey,* 384 U. S. 719. Yet it was sheer coincidence that those precise four were chosen. Any other single case in the group or any other four would have been sufficient for our purposes.

All this, and more, was stated by MR. JUSTICE BLACK in his dissent in *Linkletter* v. *Walker,* 381 U. S. 618, 640, in which I concurred. It is stated again with clarity and vigor by MR. JUSTICE HARLAN in today's dissent, Part I of which I join. It still remains a mystery how some convicted people are given new trials for unconstitutional convictions and others are kept in jail without any hope of relief though their complaints are equally

---

v. *Denno,* 388 U. S. 293, 301, the fact that the parties involved in the decision are the only litigants so situated who receive the benefit of the new rule is "an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum." Whatever inequity may arguably result from applying the new rule to those "chance beneficiaries" is "an insignificant cost for adherence to sound principles of decision-making." *Ibid.*

meritorious. At least the Court should not say as respects *Katz* that it is given "wholly prospective application," when it was made retroactive in his case.

The pretense that we were bound in *Katz* to apply the new rule retroactively to that defendant or not decide the case at all, is too transparent to need answer. See 1B J. Moore, Federal Practice 191 (2d ed. 1965); 1 K. Davis, Administrative Law Treatise § 5.09 (1958); Levy, Realist Jurisprudence and Prospective Overruling, 109 U. Pa. L. Rev. 1, 15; Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201, 216–234 (1965).

In *Johnson* v. *New Jersey,* 384 U. S. 719, 733, where we announced that the rule in *Miranda* should apply only to cases commenced after that decision had been announced, we said:

> "there are no jurisprudential or constitutional obstacles to the rule we are adopting here. . . . In appropriate prior cases we have already applied new judicial standards in a wholly prospective manner. See *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411 (1964); *James* v. *United States,* 366 U. S. 213 (1961)."

Where the spirit is strong, there has heretofore been no impediment to producing only dictum through a "case or controversy." Indeed that tradition started with *Marbury* v. *Madison,* 1 Cranch 137.

MR. JUSTICE HARLAN, dissenting.

In the four short years since we embraced the notion that our constitutional decisions in criminal cases need not be retroactively applied, *Linkletter* v. *Walker,* 381 U. S. 618 (1965),[1] we have created an extraordinary col-

---

[1] In one instance this doctrine has been applied to a nonconstitutional decision. See *Lee* v. *Florida,* 392 U. S. 378 (1968), and its aftermath in *Fuller* v. *Alaska,* 393 U. S. 80 (1968).

lection of rules to govern the application of that principle. We have held that certain "new" rules are to be applied to all cases then subject to direct review, *Linkletter* v. *Walker, supra; Tehan* v. *Shott,* 382 U. S. 406 (1966); certain others are to be applied to all those cases in which trials have not yet commenced, *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); certain others are to be applied to all those cases in which the tainted evidence has not yet been introduced at trial, *Fuller* v. *Alaska,* 393 U. S. 80 (1968); and still others are to be applied only to the party involved in the case in which the new rule is announced and to all future cases in which the proscribed official conduct has not yet occurred. *Stovall* v. *Denno,* 388 U. S. 293 (1967); *DeStefano* v. *Woods,* 392 U. S. 631 (1968).

Although it has more than once been said that "new" rules affecting "the very integrity of the fact-finding process," are to be retroactively applied, *Linkletter* v. *Walker, supra,* at 639; see also *Tehan* v. *Shott, supra,* at 416; *Fuller* v. *Alaska, supra,* at 81, this requirement was eroded to some extent in *Johnson* v. *New Jersey, supra,* at 728–729, and yet further in *Stovall* v. *Denno, supra,* at 299; see also *DeStefano* v. *Woods, supra.* Again, although it has been said that a decision will be retroactively applied when it has been "clearly foreshadowed" in our prior case law, *Johnson* v. *New Jersey, supra,* at 731; *Berger* v. *California,* 393 U. S. 314 (1969), the Court today rejects such a contention. *Ante,* at 248. Indeed, the Court now also departs from preexisting doctrine in refusing retroactive application within the federal system of the "new" rule ultimately laid down in *Katz* v. *United States,* 389 U. S. 347 (1967), despite its concession that "relatively few" federal cases would have to be reconsidered. Compare *ante,* at 251–252, with *Linkletter* v. *Walker, supra,* at 637; *Tehan* v. *Shott, supra,* at 418–419; *Johnson* v. *New Jersey, supra,* at 731–732; *Stovall* v. *Denno, supra,* at 300.

I have in the past joined in some of those opinions which have, in so short a time, generated so many incompatible rules and inconsistent principles. I did so because I thought it important to limit the impact of constitutional decisions which seemed to me profoundly unsound in principle. I can no longer, however, remain content with the doctrinal confusion that has characterized our efforts to apply the basic *Linkletter* principle. "Retroactivity" must be rethought.

## I.

### RETROACTIVITY ON DIRECT REVIEW.

Upon reflection, I can no longer accept the rule first announced two years ago in *Stovall* v. *Denno, supra,* and reaffirmed today, which permits this Court to apply a "new" constitutional rule entirely prospectively, while making an exception only for the particular litigant whose case was chosen as the vehicle for establishing that rule. Indeed, I have concluded that *Linkletter* was right in insisting that all "new" rules of constitutional law must, at a minimum, be applied to all those cases which are still subject to direct review by this Court at the time the "new" decision is handed down.

Matters of basic principle are at stake. In the classical view of constitutional adjudication, which I share, criminal defendants cannot come before this Court simply to request largesse. This Court is entitled to decide constitutional issues only when the facts of a particular case *require* their resolution for a just adjudication on the merits. See *Marbury* v. *Madison,* 1 Cranch 137 (1803). We do not release a criminal from jail because we like to do so, or because we think it wise to do so, but only because the government has offended constitutional principle in the conduct of his case. And when another similarly situated defendant comes before us, we must grant the same relief or give a principled reason for acting differently. We depart from this basic judi-

cial tradition when we simply pick and choose from among similarly situated defendants those who alone will receive the benefit of a "new" rule of constitutional law.

The unsound character of the rule reaffirmed today is perhaps best exposed by considering the following hypothetical. Imagine that the Second Circuit in the present case had anticipated the line of reasoning this Court subsequently pursued in *Katz* v. *United States, supra,* at 352–353, concluding—as this Court there did— that "the underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling." *Id.,* at 353. Would we have *reversed* the case on the ground that the principles the Second Circuit had announced—though identical with those in *Katz*—should not control because *Katz* is not retroactive? To the contrary, I venture to say that we would have taken satisfaction that the lower court had reached the same conclusion we subsequently did in *Katz.* If a "new" constitutional doctrine is truly right, we should not reverse lower courts which have accepted it; nor should we affirm those which have rejected the very arguments we have embraced. Anything else would belie the truism that it is the task of this Court, like that of any other, to do justice to each litigant on the merits of his own case. It is only if our decisions can be justified in terms of this fundamental premise that they may properly be considered the legitimate products of a court of law, rather than the commands of a super-legislature.

Re-examination of prior developments in the field of retroactivity leads me irresistibly to the conclusion that the only solid disposition of this case lies in vacating the judgment of the Court of Appeals and in remanding this case to that court for further consideration in light of *Katz.*

## II.

### Retroactivity on Habeas Corpus.

What has already been said is, from my standpoint, enough to dispose of the case before us. Ordinarily I would not go further. But in this instance I consider it desirable and appropriate to venture some observations on the application of the retroactivity doctrine in habeas corpus cases, under the prevailing scope of the "Great Writ" as set forth in this Court's 1963 decision in *Fay* v. *Noia,* 372 U. S. 391, and in today's decision in *Kaufman* v. *United States, ante,* p. 217. I believe this course is fitting because none of the Court's prior retroactivity decisions has faced up to the quite different factors which should govern the application of retroactivity in habeas corpus cases; because the retroactive application of *Katz* in habeas corpus cases would seem to be foreclosed by the present decision; because principled habeas retroactivity now seems to me to demand much more than the "purpose," "reliance," and judicial "administration" standards, *ante,* at 249, which have so far been regarded as the tests governing retroactivity in direct review and habeas corpus cases alike; and because the retroactivity doctrine is still in a developing stage. In what ensues I shall simply try to suggest some of the considerations which appear to me to lay bare the complexities of the retroactivity problem on habeas which I feel have not been sufficiently explored in past decisions, leaving expression of definitive views upon any of such considerations for future habeas cases to which they are germane.

### A.

While, as I have argued, a reviewing court has the obligation to rule upon every decisive issue properly raised by the parties on direct review, the federal courts have never had a similar obligation on habeas corpus.

Indeed, until *Brown* v. *Allen,* 344 U. S. 443 (1953), federal courts would never consider the merits of a constitutional claim if the habeas petitioner had a fair opportunity to raise his arguments in the original proceeding.[2] See my dissent in *Fay* v. *Noia, supra,* at 449–463; see also Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 463 (1963). With habeas restricted in this way, the question of applying a "new" constitutional rule to convictions which had become final arose so infrequently that the retroactivity issue could not be considered a significant one in those days. Even under *Brown,* the retroactive application of "new" rules in habeas cases did not serve to erode the finality of criminal judgments to any substantial degree. It was the rare case in which the habeas petitioner had raised a "new" constitutional argument both at his original trial and on appeal. Yet it was only in such a case that *Brown* would permit a habeas court to apply the "new" rule. Cf. *Sunal* v. *Large,* 332 U. S. 174 (1947).

The conflict between retroactivity and finality only became of major importance with the Court's decision in *Fay* v. *Noia, supra.* For the first time, it was there held that, at least in some instances, a habeas petitioner could successfully attack his conviction collaterally despite the fact that the "new" rule had not even been suggested in the original proceedings. Thus, *Noia* opened the door for large numbers of prisoners to relitigate their convictions each time a "new" constitutional rule was announced by this Court.

---

[2] An exception to this general rule was made, however, when the habeas petitioner attacked the constitutionality of the state statute under which he had been convicted. See, *e. g., Ex parte Siebold,* 100 U. S. 371 (1880). Since, in this situation, the State had no power to proscribe the conduct for which the petitioner was imprisoned, it could not constitutionally insist that he remain in jail.

I continue to believe that *Noia,* which has been given even broader scope in *Kaufman* v. *United States, supra,* constitutes an indefensible departure both from the historical principles which defined the scope of the "Great Writ" and from the principles of federalism which have formed the bedrock of our constitutional development. Nevertheless, my views on this score have not prevailed, and pending re-examination of the scope of habeas corpus, I believe myself obliged to consider on its own bottom the retroactivity problem which *Noia* has spawned, since it is a matter of the greatest importance if the integrity of the federal judicial process is to be maintained in this era of increasingly rapid constitutional change.

### B.

The greatly expanded writ of habeas corpus seems at the present time to serve two principal functions. See *Kaufman* v. *United States, supra,* at 229; Mishkin, The Supreme Court, 1964 Term—Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 77–101 (1965). First, it seeks to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted. It follows from this that all "new" constitutional rules which significantly improve the pre-existing fact-finding procedures are to be retroactively applied on habeas. See my Brother BLACK's dissent in *Kaufman* v. *United States, supra,* at 235–236. The new habeas, however, is not only concerned with those rules which substantially affect the fact-finding apparatus of the original trial. Under the prevailing notions, *Kaufman* v. *United States, supra,* at 224–226, the threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings

in a manner consistent with established constitutional standards. In order to perform this deterrence function, the habeas court need not, as prior cases make clear, necessarily apply all "new" constitutional rules retroactively. In these cases, the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place.

The theory that the habeas petitioner is entitled to the law prevailing at the time of his conviction is, however, one which is more complex than the Court has seemingly recognized. First, it is necessary to determine whether a particular decision has really announced a "new" rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law. Only a short time ago, for example, we attempted to define with more precision the conditions governing the issuance of a search warrant under the Fourth Amendment. *Spinelli* v. *United States,* 393 U. S. 410 (1969). While we had never previously encountered the precise situation raised in *Spinelli,* our decision in that case rested upon the established doctrine that a magistrate may issue a warrant only when he can judge for himself the validity of the affiant's conclusion that criminal activity is involved. *Johnson* v. *United States,* 333 U. S. 10, 14 (1948); *Aguilar* v. *Texas,* 378 U. S. 108 (1964). Surely, it could not be thought that *Spinelli* should not be retroactively applied under the expanded habeas process because it was not announced until 1969. One need not be a rigid partisan of Blackstone to recognize that many, though not all, of this Court's constitutional decisions are grounded upon fundamental principles whose content does not change dramatically from year to year, but whose meanings are altered slowly and subtly as generation succeeds generation. In such a context it appears

very difficult to argue against the application of the "new" rule in all habeas cases since one could never say with any assurance that this Court would have ruled differently at the time the petitioner's conviction became final.

In the *Katz* case, however, one can say with assurance that there was a time at which this Court would have ruled differently. For in *Olmstead, Goldman,* and *On Lee,*[3] the Court did just that. Even under the prevailing view of habeas, this fact should be of significance. Although the threat of collateral attack may be necessary to assure that the lower federal and state courts toe the constitutional line, the lower courts cannot be faulted when, following the doctrine of *stare decisis,* they apply the rules which have been authoritatively announced by this Court. If anyone is responsible for changing these rules, it is this Court.

Even in this situation, however, the doctrine of *stare decisis* cannot always be a complete answer to the retroactivity problem if a habeas petitioner is really entitled to the constitutional law which prevailed at the time of his conviction. Consider, for example, the state of Fourth Amendment law as it existed after our decision in *Silverman* v. *United States,* 365 U. S. 505 (1961). As my Brother STEWART notes today, *ante,* at 248, *Silverman* went a long way toward rejecting the principles supporting the *Goldman* and *Olmstead* rules. The Court in *Silverman* cautioned that the scope of the Fourth Amendment's protection is "not inevitably measurable in terms of ancient niceties of tort or real property law." 365 U. S., at 511. The majority's opinion concluded with the warning: "We find no occasion to re-examine *Goldman* here, but we decline to go beyond it, by even a fraction of

[3] *Olmstead* v. *United States,* 277 U. S. 438 (1928); *Goldman* v. *United States,* 316 U. S. 129 (1942); *On Lee* v. *United States,* 343 U. S. 747 (1952).

an inch." *Id.*, at 512. It is hard to believe that any lawyer worthy of the name could, after reading *Silverman,* rely with confidence on the continuing vitality of the *Goldman* rule. Nor is it by any means clear to me that it would have been improper for a lower court to have declined to follow *Goldman* in the light of *Silverman.*[4] Given the deterrence purpose of the expanded habeas corpus, it thus could be persuasively argued that the *Katz* rule should be applied to all cases which had not become final at the time *Silverman* was decided.[5]

---

[4] After *Silverman* was decided, we were careful to frame our decisions in such a way that a direct consideration of the "trespass" doctrine could be avoided. In *Lopez* v. *United States*, 373 U. S. 427, 439 (1963), we noted that: "The validity of [*Olmstead* and *Goldman*] is not in question here. Indeed this case involves no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant . . . ." In *Berger* v. *New York*, 388 U. S. 41, the Court found that New York's eavesdropping statute contained impermissibly vague standards even with regard to the authorization of electronic surveillance requiring a trespass. It concluded that "[t]his disposition obviates the necessity for any discussion of the other points raised." *Id.*, at 44. Moreover, *Berger* made it clear that we had rejected *Olmstead*'s declaration that the Fourth Amendment did not protect the integrity of private conversations. Such an action would hardly strengthen a lawyer's or lower court's confidence in the continuing vitality of the "trespass" doctrine, which is also rooted in *Olmstead.*

Finally, the Court's suggestion that our unexplicated *per curiam* reversal in *Clinton* v. *Virginia*, 377 U. S. 158 (1964), was premised upon the "trespass" doctrine, see *ante*, at 248, n. 11, is not supported by the opinion in that case. Only Mr. Justice Clark expressly predicated his decision upon the doctrine. The other seven members of the majority did not state the ground upon which the reversal was based.

[5] While I do not question much that my Brother FORTAS says in his dissenting opinion, I am unable to adopt the extreme position

## C.

*Katz,* of course, has been one of the lesser innovations of a decade that has witnessed revolutionary changes in the most fundamental premises of hitherto accepted constitutional law. And similar difficulties arise as to the retroactive application of the Court's other landmark decisions if one is to insist that a habeas petitioner is entitled to the law as it stood at the time of his conviction. It is possible to argue, for example, that the Court's decision in *Mapp* v. *Ohio,* 367 U. S. 643 (1961), imposing the exclusionary rule on the States, was a sufficient indication to the lower courts that they should no longer rely on the doctrine of *stare decisis* when confronted with the claim that other Bill of Rights guarantees should be incorporated into the Due Process Clause of the Fourteenth Amendment. It would follow from this position that all subsequent decisions incorporating various other provisions of the Bill of Rights into Due Process should be applied to all cases arising on habeas which were pending on appeal at the time *Mapp* was decided.

On the other hand, one could argue that *stare decisis* was still the appropriate rule for the lower courts until this Court made it clear that a particular guarantee was applicable to the States. It would follow from this position that the Court's decision in *Griffin* v. *California,*

---

on retroactivity he proposes. Before *Silverman* was decided in 1961, no decision of this Court had undermined the conceptual basis of the *Olmstead* rule. Before 1961, even the most conscientious police department or judge had no reason to doubt the validity of the "trespass" rule. Nevertheless, MR. JUSTICE FORTAS would grant habeas corpus to prisoners whose convictions became final before *Silverman.* This result cannot be justified even if one assumes that it is proper for a habeas court to require "conceptual faithfulness" to our opinions and "not merely decisional obedience" to the rules they announce. See *post,* at 277.

380 U. S. 609 (1965), should be retroactively applied only to *Malloy* v. *Hogan,* 378 U. S. 1 (1964), which was the first case beginning the process of incorporating the Fifth Amendment's privilege against self-incrimination, and that *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), should not be applied to any of those cases which had become final before that decision required the States to provide criminal jury trials on the same basis as the Federal Government.

Neither of these positions would be squarely inconsistent with the Court's new view of habeas corpus. Indeed, if the Court in *Mapp* had given any indication whatever that it accepted my Brother BLACK's "incorporationist" philosophy in its pristine purity, see *Adamson* v. *California,* 332 U. S. 46, 68–123 (1947), it would appear that it would have been improper for the lower courts to rely on the old precedents to respond to the new claims advanced by criminal defendants. However, the Court has never accepted MR. JUSTICE BLACK's constitutional premises in full-blown form. Instead, it has embarked on a course of "selective incorporation" in which the nature of each particular Bill of Rights guarantee has been examined before it was imposed upon the States. Given the *ad hoc* character of this approach, and given the fundamental place of federalism in the traditional conception of constitutional adjudication, it could certainly be strongly argued that the lower courts could properly follow the traditional due process approach until the time this Court made it clear that a particular Bill of Rights guarantee had been incorporated.

The relationship for retroactivity purposes among the *Escobedo, Miranda, Wade,* and *Gilbert* decisions [6] presents another difficult problem under the new habeas

---

[6] *Escobedo* v. *Illinois,* 378 U. S. 478 (1964); *Miranda* v. *Arizona,* 384 U. S. 436 (1966); *United States* v. *Wade,* 388 U. S. 218 (1967); *Gilbert* v. *California,* 388 U. S. 263 (1967).

corpus concept. It can be argued that the "line-up" cases, *Wade* and *Gilbert,* should be retroactively applied to all those cases pending when *Miranda* was decided. Since *Miranda* placed affirmative requirements upon police officers to assure that the accused would have an opportunity to obtain counsel at one "critical stage" of the criminal process, neither police officials nor the lower courts, it might be argued, could properly assume that other critical stages would not be comparably treated. Similarly, it may be suggested that the rules announced in both *Miranda* and the "line-up" cases should be applied to all cases still pending on appeal when *Escobedo* v. *Illinois* announced that the Sixth Amendment applied in the police station. For *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), had already established the proposition that the State must provide free counsel to indigents at the criminal trial.

It is doubtless true that a habeas court encounters difficult and complex problems if it is required to chart out the proper implications of the governing precedents at the time of a petitioner's conviction. One may well argue that it is of paramount importance to make the "choice of law" problem on habeas as simple as possible, applying each "new" rule only to those cases pending at the time it is announced. While this would obviously be simpler, simplicity would be purchased at the cost of compromising the principle that a habeas petitioner is to have his case judged by the constitutional standards dominant at the time of his conviction.

I do not pretend to have exhausted in the foregoing discussion all the complexities of the retroactivity problem on habeas. But the considerations I have canvassed suggest that we should take a hard look at where we are going in the retroactivity field so that this new doctrine may be administered in accordance with the basics of the

judicial tradition. Unfortunately, the Court does not even attempt this task.

For the reasons stated in Part I of this opinion I cannot subscribe to the affirmance of the judgment of the Court of Appeals. I would remand the case to that court for reconsideration in light of *Katz* v. *United States.*

MR. JUSTICE FORTAS, dissenting.*

The decisions today in *Kaiser* v. *New York* and *Desist* v. *United States* apply to only the limited number of cases where the constitutionally forbidden wiretap or eavesdropping occurred prior to December 18, 1967. It was on that day that we decided *Katz* v. *United States,* 389 U. S. 347, which administered the formal *coup de grace* to the moribund doctrine of *Olmstead* v. *United States,* 277 U. S. 438 (1928). The Court in effect grants absolution to police invasions of individual privacy by wiretaps and electronic devices not involving physical trespass, as long as the unconstitutional conduct took place before *Katz.* It holds that only from and after *Katz* will it apply the Fourth Amendment's command without reference to whether a physical trespass was involved. The significance of the decisions is not only that they deprive a relatively few convicted persons of their constitutional rights, but also that they diminish the Constitution; they imply that the availability of constitutional principle can be the subject of judicial choice in circumstances which, I respectfully submit, are far from compelling. I cannot agree.

The Court says that it has authority to determine whether a ruling will be made "retroactive," and it gives several reasons for its decision not to apply *Katz* "retroactively": (1) *Katz* "was a clear break with the

---

*[This opinion applies also to No. 62, *Kaiser* v. *New York, post,* p. 280.]

past" because it repudiated *Olmstead*'s requirement of a physical trespass into the accused's home or office, *ante*, at 248; (2) the purpose of the *Katz* rule excluding evidence even where there was no physical intrusion was to deter police invasion of constitutional rights, a purpose that would not be aided by "retrospective" application of the ruling; (3) police and courts alike, until *Katz*, justifiably relied upon the continuing vitality of *Olmstead;* and (4) it would unduly burden law administration to apply *Katz* "retroactively." The Court derives these factors from various of its decisions, commencing with *Linkletter* v. *Walker*, 381 U. S. 618 (1965),[1] in which decisions of this Court have been held to apply prospectively only.[2]

---

[1] *Linkletter* held that the Court's decision in *Mapp* v. *Ohio*, 367 U. S. 643 (1961), that illegally seized evidence was not admissible in state prosecutions, should not be applied "retroactively." In *Tehan* v. *Shott*, 382 U. S. 406 (1966), the Court held that its decision in *Griffin* v. *California*, 380 U. S. 609 (1965), that it violates the privilege against self-incrimination for the prosecution or the trial judge to comment on a criminal defendant's failure to testify in his defense, should not apply "retroactively." *Johnson* v. *New Jersey*, 384 U. S. 719 (1966), held that *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), and *Miranda* v. *Arizona*, 384 U. S. 436 (1966), should not apply "retroactively." *Stovall* v. *Denno*, 388 U. S. 293 (1967), held that *United States* v. *Wade*, 388 U. S. 218 (1967), and *Gilbert* v. *California*, 388 U. S. 263 (1967), both of which related to the right to counsel at a pretrial lineup, should not be applied "retroactively." In *DeStefano* v. *Woods*, 392 U. S. 631 (1968), the Court held that the right to trial by jury in state criminal prosecutions that had been established in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), and *Bloom* v. *Illinois*, 391 U. S. 194 (1968), was not "retroactive." Finally, the Court held in *Fuller* v. *Alaska*, 393 U. S. 80 (1968), that *Lee* v. *Florida*, 392 U. S. 378 (1968), was not "retroactive." *Lee* ruled that evidence obtained in violation of § 605 of the Federal Communications Act of 1934, 48 Stat. 1103, 47 U. S. C. § 605, was inadmissible in state criminal prosecutions.

[2] The meaning of "prospectivity" or "non-retroactivity" has varied in the Court's decisions. In *Linkletter* v. *Walker*, *supra*, n. 1, and

In my judgment the Court's holding is of pervasive importance because it adds new and unhappy dimensions to the "non-retroactivity" doctrine. Not only does the Court deny the benefit of a fundamental constitutional provision, and not merely of court-made rules implementing a constitutional mandate [3] or of a statutory principle,[4] to a class of persons because of the chance operation of the judicial calendar; it does so in face of the fact that the ruling at issue is neither novel nor unanticipated. The Court's statement to the contrary is, as I shall discuss, simply insupportable.

## I.

I do not challenge this Court's power to decline to apply newly devised rules implementing constitutional principles to prior cases or situations, or its authority to make similar accommodation when it changes long-

---

*Tehan* v. *Shott, supra,* n. 1, *Mapp* and *Griffin* were said not to apply to convictions that had become final prior to the announcement of those decisions. But *Mapp* and *Griffin* were applied to cases pending on direct review at the time of those decisions. *Johnson* v. *New Jersey, supra,* n. 1, by contrast, held *Miranda* and *Escobedo* applicable only to trials begun after *Miranda* and *Escobedo* were announced. *Stovall* v. *Denno, supra,* n. 1, held that the *Wade* and *Gilbert* decisions should apply only to cases in which the illegal official conduct took place after the date of decision. *DeStefano* v. *Woods, supra,* n. 1, held that *Duncan* and *Bloom* should apply only to cases where the trial commenced after the date of decision, a date which, since these cases involved the right to jury trial, was apt to coincide with the date of the official conduct. *Fuller* v. *Alaska, supra,* n. 1, held that *Lee* v. *Florida, supra,* n. 1, would apply only in cases in which the illegally obtained evidence was introduced after the date of decision. In all of these cases, the new rule was applied also in the case in which it was announced.

[3] Cf. *Miranda* v. *Arizona,* 384 U. S. 436 (1966) (rules concerning in-custody interrogation); *Mapp* v. *Ohio,* 367 U. S. 643 (1961) (exclusionary rule).

[4] Cf. *Fuller* v. *Alaska,* 393 U. S. 80 (1968).

standing statutory interpretations. Most of the Court's "non-retroactivity" holdings have emerged in state cases dealing with the application of a ruling that was relatively unpresaged and the practical effect of which, if applied to the past as well as the future, would be acutely disruptive of state practice and institutions. In those cases the pressures of comity and the hesitancy drastically to nullify state actions lent special force to the demand that the decision should not be applied "retroactively." In *DeStefano* v. *Woods,* 392 U. S. 631 (1968), for example, these circumstances were deemed to warrant only prospective application of the right to trial by jury in state prosecutions that was established in *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and *Bloom* v. *Illinois,* 391 U. S. 194 (1968).

The Court so held even though it thereby let stand convictions that had been rendered pursuant to a faulty reading of the Constitution. Even where considerations that favor "non-retroactivity" exist, however, a new constitutional rule will not always be "non-retroactively" applied. The Court has insisted that all persons, not just those selected by the chance of the calendar, receive the benefit of newly declared constitutional commands that are central to the reliability of the fact-finding process at trial and without which innocent persons may have been adjudged guilty. See, *e. g., Roberts* v. *Russell,* 392 U. S. 293 (1968) (holding retroactive *Bruton* v. *United States,* 391 U. S. 123 (1968)); *McConnell* v. *Rhay,* 393 U. S. 2 (1968) (holding retroactive *Mempa* v. *Rhay,* 389 U. S. 128 (1967)); *Arsenault* v. *Massachusetts,* 393 U. S. 5 (1968) (holding retroactive *White* v. *Maryland,* 373 U. S. 59 (1963)); *Berger* v. *California,* 393 U. S. 314 (1969) (holding retroactive *Barber* v. *Page,* 390 U. S. 719 (1968)); *Gideon* v. *Wainwright,* 372 U. S. 335 (1963); *Griffin* v. *Illinois,* 351 U. S. 12 (1956); *Jackson* v. *Denno,* 378 U. S. 368 (1964).

In the present cases, the Court decides that the lawfulness of wiretaps and electronic eavesdropping occurring before December 18, 1967, will be controlled by *Olmstead* v. *United States, supra,* a decision that the Court agrees is a false and insupportable reading of the Constitution. The Court holds that the Fourth Amendment meant something quite different before *Katz* was decided than it means afterwards; that Katz and persons whose rights are violated after the date of that decision may have the benefit of the true meaning of the constitutional provision, but that those who were victims before *Katz* may not.

If such a distinction in the application of a substantive constitutional principle can ever be justified, it can be only in the most compelling circumstances. Such circumstances might possibly exist if the newly announced principle related only to the States, in that it extended to the States a principle heretofore deemed to apply only to the Federal Government, or if "retroactive" application would place an extreme burden on the administration of justice; if the new ruling were wholly unanticipated in the decisions of the Court; and if the new rule did not directly and clearly affect the fairness of the trial. Cf. *DeStefano* v. *Woods, supra; Johnson* v. *New Jersey,* 384 U. S. 719 (1966); *Linkletter* v. *Walker, supra.* But there is no justification for refusing "retroactive" application to a constitutional principle merely because of an earlier reading of the Constitution that had been widely repudiated as unsound and that this Court's own intervening opinions had discredited, although not expressly overruled. *Olmstead* is in this category. *Katz* did no more than administer the *coup de grace* to its moribund doctrine. The action of the Court today cannot be justified by claiming that it is required by *Olmstead's* continued vitality. On the contrary, the Court today breathes life into *Olmstead's* corpse.

## II.

In *Kaiser* v. *New York,* the Court affirms a state conviction despite the fact that the conviction was based upon telephone conversations that the police had recorded by a wiretap. The petitioner made the telephone calls to a coconspirator at a bar in Manhattan. The police had installed a wiretap device in the terminal box in the building where the bar was located.

The taps were made pursuant to a warrant issued under a New York statute. The warrant cannot, however, support the use of the wiretap evidence, for in *Berger* v. *New York,* 388 U. S. 41, decided on June 12, 1967, we held that the New York statute did not comply with Fourth Amendment requirements. The Court's decision rests instead on the fact that the petitioner's conversations were intercepted and recorded without a trespass and on the assertion that the *Olmstead* doctrine was fully viable at the time that the petitioner's telephone conversations were overheard.

In *Desist* v. *United States,* the federal case decided today, the federal agents attached the "uninvited ear" of the microphone to the outer instead of the inner panel of the double door separating their hotel room from that of the petitioners. Because of this distinction, their conduct is today held to be immunized from Fourth Amendment attack. *Olmstead* would sanction the differentiation. If the microphone had been attached to the inner panel, or if the agents had used a device that impinged by 1/1000th of an inch upon the room rented by petitioners, *Olmstead* would not have sanctified the result. See *Silverman* v. *United States,* 365 U. S. 505 (1961).[5]

---

[5] If the evidence introduced in *Desist* had been obtained by telephone wiretap, I assume the majority would have to agree that it could not be used at trial. This is a federal case, and as early as

This distinction is, of course, nonsense, as I suppose most rational persons would agree; and I am unwilling to suppose that if the majority in *Olmstead* had foreseen the ensuing development and uninhibited use of electronic devices for searching out and seizing the words of others, it would have nevertheless allowed the perimeter of physical property rights to limit the Fourth Amendment's protection of citizens' privacy from unseen invasion.

In any event, there is no doubt that *Olmstead* was thoroughly repudiated by this Court long before December 18, 1967, when *Katz* was decided. *Katz* is not responsible for killing *Olmstead*. Prior cases had left the physical-trespass requirement of *Olmstead* virtually lifeless and merely awaiting the death certificate that *Katz* gave it. They demonstrated to all who were willing to receive the message that *Olmstead* would not shield eavesdropping because it took place outside the physical property line. *Silverman* v. *United States, supra; Clinton* v. *Virginia,* 377 U. S. 158 (1964); *Berger* v. *New York, supra.*

Not for 17 years, until this day, has this Court applied *Olmstead* to sanction a Fourth Amendment violation because of *Olmstead*'s peculiar distinction.[6] Statements by the Department of Justice in recent years have placed

---

1937 this Court held that evidence obtained in violation of § 605 of the Federal Communications Act, 48 Stat. 1103, 47 U. S. C. § 605, may not be received in evidence in a federal court. *Nardone* v. *United States,* 302 U. S. 379. The fact that a telephone wiretap would not be admissible in the circumstances of this case further elucidates the whimsicality of the present decision. As a result of the chance sequence of decisions, the Court gives less scope to the Federal Government's violation of constitutional mandate than the Court would permit in the case of disregard of a statutory command.

[6] The Court did apply the *Olmstead* doctrine in *On Lee* v. *United States,* 343 U. S. 747 (1952). See also *Goldman* v. *United States,* 316 U. S. 129 (1942).

no reliance upon *Olmstead*'s quaint constriction of the individual's area of privacy.[7] The Omnibus Crime Control and Safe Streets Act of 1968, recently enacted by Congress, does not recognize *Olmstead*'s long-outmoded distinction between permissible and impermissible invasions of privacy. That statute requires judicial authorization for wiretaps and electronic surveillance, whether or not they would involve a physical trespass. Pub. L. 90–351, Tit. III, 82 Stat. 211. The New York statute involved in *Kaiser* purports to require warrants for eavesdropping, but it makes no such absurd distinction as *Olmstead* describes. N. Y. Code Crim. Proc. § 813–a.

Only those police officials and courts whose devotion to wiretapping and electronic surveillance is so intense as to induce them to exploit those techniques until the last spade of earth is shoveled on the doctrinal corpse have continued to rely on *Olmstead*. It is not the least of the unfortunate consequences of today's decisions that they validate this kind of foot-dragging. They reward those who fought the battle for

---

[7] See, *e. g.,* Hearing pursuant to S. Res. 62 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 86th Cong., 1st Sess., pt. 4, 1034–1035, 1036 (1959); Hearings on S. 1086, S. 1221, S. 1495, and S. 1822 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 87th Cong., 1st Sess., 372–373 (1961); Hearings on S. 2813 and S. 1495 before the Senate Committee on the Judiciary, 87th Cong., 2d Sess., 11–46 (1962); Hearings pursuant to S. Res. 39 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 3, 1154–1165 (1965); Hearings on S. 2187 and other bills before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., 33–35 (1966); Hearings pursuant to S. Res. 25 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 48–58 (1967); Brownell, The Public Security and Wire Tapping, 39 Cornell L. Q. 195 (1954); Rogers, The Case for Wire Tapping, 63 Yale L. J. 792 (1954).

uncontrolled police eavesdropping to the bitter end, despite the clear, though undelivered, verdict. They add this Court's approval to those who honor the Constitution's mandate only where acceptable to them or compelled by the precise and inescapable specifics of a decision of this Court. And they award dunce caps to those law enforcement officers, courts, and public officials who do not merely stand by until an inevitable decree issues from this Court, specifically articulating that which is clearly immanent in the fulfillment of the Constitution, but who generously apply the mandates of the Constitution as the developing case law elucidates them.

The full realization of our great charter of liberty, set forth in our Constitution, cannot be achieved by this Court alone. History does not embrace the years needed for us to hold, millimeter by millimeter, that such and such a penetration of individual rights is an infringement of the Constitution's guarantees. The vitality of our Constitution depends upon conceptual faithfulness and not merely decisional obedience. Certainly, this Court should not encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.

The best evidence of the moribund state of *Olmstead* at the time *Katz* was decided is the Court's opinion in *Katz* itself. That opinion acknowledged and relied upon the fact that *Olmstead* had long ceased to have vitality. In *Katz,* the Court said:

> "It is true that the absence of [physical] penetration was at one time thought to foreclose further Fourth Amendment inquiry, *Olmstead* v. *United States,* 277 U. S. 438, 457, 464, 466; *Goldman* v. *United States,* 316 U. S. 129, 134–136, for that Amendment was thought to limit only searches and seizures of tangible property. But '[t]he premise that property interests control the right of the Gov-

ernment to search and seize has been discredited.'
*Warden* v. *Hayden,* 387 U. S. 294, 304. Thus, al-
though a closely divided Court supposed in *Olmstead*
that surveillance without any trespass and without
the seizure of any material object fell outside the
ambit of the Constitution, we have since departed
from the narrow view on which that decision rested.
Indeed, we have expressly held that the Fourth
Amendment governs not only the seizure of tangible
items, but extends as well to the recording of oral
statements, overheard without any 'technical tres-
pass under . . . local property law.' *Silverman* v.
*United States,* 365 U. S. 505, 511. Once this much
is acknowledged, and once it is recognized that the
Fourth Amendment protects people—and not simply
'areas'—against unreasonable searches and seizures,
it becomes clear that the reach of that Amendment
cannot turn upon the presence or absence of a phys-
ical intrusion into any given enclosure.

"We conclude that the underpinnings of *Olmstead*
and *Goldman* have been so eroded by our subse-
quent decisions that the 'trespass' doctrine there
enunciated can no longer be regarded as control-
ling. . . ." 389 U. S., at 352–353.

Since *Katz* itself recognized that *Olmstead* had been
"eroded by our subsequent decisions" and that we had
"since departed from the narrow view on which [it] . . .
rested," how can the Court now say that because *Katz*
overruled *Olmstead* it "was a clear break with the past"?
The issue presented by *Desist* and *Kaiser* is *not* whether
the petitioners will be given the benefit of *Katz*. The
issue is *not* whether *Katz* is "retroactive." The issue is
whether *because* in *Katz* we formally announced that
the "reach of [the Fourth Amendment] . . . cannot turn
upon the presence or absence of a physical intrusion into
any given enclosure," persons claiming the benefit of

this principle prior to that date must be denied its protection. It is, I submit, entirely appropriate to state the issue in these terms because there can be no doubt whatever that if the present cases had been presented to this Court a day, a year, or a number of years before *Katz*, we would have held that the petitioners' constitutional rights had been violated, and that the petitioners were entitled, like any other citizens, to their constitutional rights. In these circumstances, I utterly fail to see how today's decisions can be justified. It is indeed a paradox that *Katz*, whose role it was to bury the corpse of *Olmstead*, is here being used to revive it.