Glenn **SUTTON**, Jr., Appellant,

v.

**UNITED STATES** of America, Appellee.

**UNITED STATES** of America

v.

Robert F. **BIGSBY**, Appellant.

Nos. 22210, 22342.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1970.

Decided Aug. 19, 1970.

Petition for Rehearing in No. 22210 Denied Sept. 22, 1970.

Mr. Neal Michael Mayer, Washington, D. C. (appointed by this Court), for appellant in 22,210.

Mr. Alan S. Ward, Washington, D. C. (appointed by this Court), for appellant in 22,342.

Mr. Edwin K. Hall, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Theodore Wieseman, Asst. U. S. Attys., were on the brief, for appellee. Mr. David G. Bress, U. S. Atty. at the time the record was filed, also entered an appearance for appellee. Mr. Clarence A. Jacobson, Asst. U. S. Atty., also entered an appearance for appellee in 22,210.

Before McGOWAN and MacKINNON, Circuit Judges, and JAMESON,* Senior District Judge.

MacKINNON, Circuit Judge:

At about 12 o'clock noon on August 3, 1967, two armed men robbed the Executive House Motel in the District of Columbia. One man, later identified as appellant Bigsby, entered the auditor's office, told three employees there present that they would be shot if they moved, and then stole the motel's payroll (which was contained in payroll envelopes) [1] and other money from the office. In the middle of the robbery, when Bigsby was filling some bank bags with money, another armed man entered the auditor's office, Bigsby handed him a couple of the bags containing money, and the two robbers then together took the three employees from the auditor's office next door into the sales office of the motel, told them to stay and the two then left the building and escaped.

The Government also presented evidence that the second man, later identified as appellant Sutton, had originally entered the sales office at about the time Bigsby first entered the auditor's office. These two offices are on the same floor, only about ten feet apart. When he entered the sales office Sutton had a gun and a paper bag. He told the sales manager and his secretary (Heher and Birney) to "Put your heads down, this is a holdup." They complied and Sutton then left the room for about two or three minutes when he returned and placed them in the closet of the sales office. About ten minutes later the employees from the auditor's office opened the closet door and the sales office employees then joined them and reported the robbery to the manager who reported it to the police.

Shortly thereafter the five employee-witnesses were taken to police headquarters and were shown several hundred photographs, but no identifications were made. A few days later, a police detective received a tip that appellant Bigsby was one of the robbers and he took a single photograph of Bigsby to the motel and asked the witnesses if they could identify the picture. The witnesses were separated for this purpose, and two of the three employees who were in the auditor's office during the robbery positively identified Bigsby, the third being less certain.[2]

A warrant then issued for Bigsby's arrest and he was arrested ten days later at his apartment. The apartment was searched incident to his arrest and a number of the individual payroll envelopes were found on or under the couch or daybed in the living room.[3]

Later that afternoon Bigsby was placed in a lineup at police headquarters at which time all three of the employees who were in the auditor's office at the time of the robbery identified Bigsby as one of the robbers. Bigsby was represented by counsel at the time of this lineup.

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 294(d).

1. There was a separate envelope containing cash for each employee.

2. The two employees in the sales office did not have an opportunity during the robbery to observe the man identified as appellant Bigsby.

3. There was an inconsistency in the seizing officer's testimony as to where the envelopes were found. See note 10 and text infra.

Thereafter appellant Bigsby implicated appellant Sutton as the other robber who participated in the robbery with him and a warrant issued for Sutton's arrest. Sutton was subsequently arrested in Camden, New Jersey, and taken before a United States Commissioner there at which time bond was set and a removal hearing scheduled. At the removal hearing four days later, the report of the United States Commissioner to the court stated that Sutton had voiced no objection to his removal to the District of Columbia and he was transported back to the District two days later. Upon his arrival, he appeared before a local United States Commissioner so that bail could be set. Later that day he was identified in his cellblock as one of the robbers by the two employees who were present in the sales office at the time of the robbery.[4] Sutton was represented at this lineup by two "substitute" counsel from the local Legal Aid Agency.

Prior to trial, appellant Bigsby moved to suppress the payroll envelopes which were seized at his apartment at the time of his arrest. At the hearing, the policemen involved testified that the pay envelopes were found in a paper bag under the daybed in the living room during the course of a search of Bigsby's entire apartment. The court permitted the introduction of this evidence on the authority of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

At trial, counsel for both appellants questioned the procedures used by the police in obtaining their clients' identifications and a hearing was held out of the presence of the jury. Counsel for Bigsby argued this his client's lineup was improper primarily on the ground that of the five participants only Bigsby wore a dark shirt. The detective in charge of the lineup testified that the reason he didn't have the participants remove their shirts was that one of the witnesses had stated that the robber had a tatoo on his arm. After hearing this evidence, the court ruled that Bigsby's lineup was proper.

The facts surrounding the identification of appellant Sutton were also explored at this time. It developed that Sutton was identified out of a group of five while in his cellblock. His counsel stated that he had no objection to the introduction of evidence of this identification.

The Government relied primarily on identification evidence at the trial. The three employees present in the auditor's office all positively identified Bigsby as the man who had entered their office. These employees testified that they had ample opportunity to observe the robber,[5] that the lighting was good and that they had previously identified Bigsby in the lineup. Moreover, it was brought out that the witnesses' original descriptions of the robber to the police were consistent with each other.

The pay envelopes seized in Bigsby's apartment were then introduced into evidence along with the seizing officer's testimony that he found the envelopes on a couch in the living room. An employee of the motel testified that these pay slips were the ones taken from the motel.

The Government's case against Sutton was similarly based on identification evidence. The two employees who were in the sales office at the time of the robbery both positively identified Sutton as one of the robbers and testified that they had previously identified him at a lineup in his cellblock.[6]

---

4. Although the man identified as Sutton had apparently entered the auditor's office momentarily, the three employees there did not have sufficient opportunity to observe him in order to make an identification.

5. Mrs. Jean Messler testified that she observed Bigsby for about ten minutes; Mr.

Robert Palmer had 5–10 minutes to observe him; Mr. George McNaughton had 30 seconds to one minute.

6. Miss Barbara Birney testified that she observed Sutton for 45 seconds to one minute; although the other witness, Mr. James Heher, testified that he had only 5 to 6 seconds to observe Sutton, he did

Neither appellant took the stand or introduced any evidence. The jury found both appellants guilty of robbery and five counts of assault with a deadly weapon. Appellant Bigsby was sentenced to five to fifteen years for the robbery and three years and four months to ten years for each of the assaults with the assault sentences to run concurrently with each other but consecutively to the robbery sentence. Appellant Sutton was similarly given five to fifteen years for the robbery and two to six years for each of the assaults with the assault sentences to run concurrently with each other but consecutively to the robbery sentence.

On this appeal, both appellants allege several points of error. We consider all of the points to be without merit and affirm both convictions. We shall treat appellant Bigsby's contentions first.

No. 22342—*United States v. Bigsby*

## I

Appellant Bigsby first argues that the procedures used in his identification were so suggestive that they violated due process of law under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).[7] He points to his original identification by means of a single photograph as being patently unfair. He argues that when this unfairness is coupled with his lineup, in which he was the only one of the five participants wearing a dark shirt, the violation of due process is clear.

The Government agrees with appellant that the showing of a single photograph might be considered somewhat suggestive under the purview of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).[8] In that case,

petitioner Simmons had originally been identified shortly after a bank robbery by means of group photgraphs which included him and others. Mr. Justice Harlan, writing for the majority, first discussed the potential dangers of photographic identifications, making specific reference to the danger of suggestiveness inherent in identification by means of a single photograph. However, despite the dangers of misidentification, the Court declined to prohibit this technique in aid of law enforcement. The Court stated:

> Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. * * * We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. * * * Simmons v. United States, *supra*, 390 U.S. at 384, 88 S.Ct. at 971.

Justice Harlan then went on to find that the identification of Simmons did not violate due process. In so doing, he noted that it could not be argued that

state that he got a "very good look" at the man and was positive that Sutton was the ·man.

7. Since appellant Bigsby was represented by counsel at the time of the lineup, no problems under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), are involved in this appeal.

8. *See also* Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176 (decided

June 30, 1969). In that case, a panel of this court held that a single photograph identification impermissibly tainted a subsequent in-court identification when the circumstances of the case indicated that the witness was under "strong psychological pressure" to make an identification. No such factor is present in the instant case.

the photographic identifications were unnecessary, since a serious felony had just been committed, the inconclusive clues the FBI had led to Simmons and another, and it was essential "for the FBI agents to determine whether they were on the right track." Secondly, he noted that the circumstances of the case left little chance for misidentification, *i.e.,* the witnesses had a good opportunity to observe the bank robbers, the photographs were shown to the witnesses shortly after the robbery while their memories were still fresh, at least six group photographs were shown, and the FBI agents did not suggest which persons in the photographs were suspected. Finally, Justice Harlan noted that the initial identifications were later confirmed in subsequent viewings of the photographs and at trial where, notwithstanding cross-examination, none of the witnesses expressed doubts as to their identifications.

■ Many of these factors are present in the instant case. Here, as in *Simmons,* a serious felony had been committed, the inconclusive leads the police had led to Bigsby, and it was obviously essential that the police determine if they were on the right track. Moreover, the witnesses here also had an excellent opportunity to observe the man they later identified as Bigsby.[9] The employees originally looked at several hundred photographs without making any identification and the single photograph was shown within a week after the robbery, the witnesses were separated for purposes of viewing it, and no allegation is made that the police did any more than simply ask the witnesses if they could make an identification of the photograph. In addition, a factor not present in *Simmons* but present here is the verification of the original identification by the witnesses at a lineup held at police headquarters at which time Bigsby was represented by counsel. Finally, all three of the witnesses identified Bigsby at trial and remained positive of their identifications during cross-examination.

Thus many of the factors which led the Supreme Court to uphold the identification in *Simmons* are present in the instant case. Appellant Bigsby, however, contends that the fact that his original identification was made by means of a single photograph is sufficient to distinguish the two cases. In passing on this contention, we note that the Court in *Simmons* declined to prohibit the use of photographic identifications even though aware of the dangers inherent in final identification by means of a single photograph. Thus we do not think that the fact that two of the witnesses finally recognized Bigsby from a single photograph after previously having looked at several hundred photographs in itself provides a sufficient ground for reversal; rather we think that this fact must be viewed in conjunction with all the other circumstances in passing on the ultimate due process question. And when we consider the excellent opportunity the witnesses had to observe the holdup man they identified as Bigsby and their subsequent positive identification of him both at the lineup and at the trial, we are of the opinion that appellant has not shown a "very substantial likelihood of irreparable misidentification." Simmons v. United States, *supra,* 390 U.S. at 384, 88 S.Ct. at 971. In reaching this conclusion, we are buttressed by the fact that the Supreme Court has upheld one-to-one facial confrontations in the circumstances of the only two cases where the question has been presented. *See* Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968) (affirmed by an equally divided Court); Stovall v. Denno, *supra.*

Our conclusion in this respect is not altered by Bigsby's claim of unfairness in that of the five men in the lineup, only he wore a dark shirt. In the context of the holdup, a dark shirt is of no significance as the robber identified as Bigsby had worn a yellow shirt. Although Bigsby's counsel objected to this·fact at the time of the lineup, the officer in charge refused to have the men remove their shirts since one of the robbers had

9. See note 5 *supra.*

been described as having a tatoo on his arm. No other objection is lodged against the conduct of the lineup, and we are of the opinion that the contrast in shirt colors did not so taint the lineup as to constitute a violation of due process.

## II

Appellant Bigsby next argues that the payroll envelopes seized at his apartment at the time of his arrest should not have been admitted into evidence against him.

At the onset, we note there is an inconsistency in the evidence relating most directly to the seizure of the payroll envelopes. The seizing officer testified at the Motion to Suppress that he found the envelopes in a paper bag *under* a daybed in the living room, whereas at trial he testified that he found them *on* a couch in the living room, apparently in "plain view." [10] In any event, other testimony at the Motion to Suppress indicates that Bigsby's entire apartment was searched although the envelopes were seized at the beginning of the search. On this evidence, the trial court found that the envelopes had been seized in a lawful search incident to arrest and admitted them into evidence on the basis of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

■■ Appellant Bigsby now contends that the standards announced in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), should govern this appeal, rather than the standards existing at the time of the search. We do not agree. We are of the opinion that *Chimel* should not be retroactively applied, and since the search of Bigsby's apartment was clearly permissible under the standards existing at the time of the search,[11] we affirm the trial court's deci-

sion in allowing the envelopes into evidence.

The Supreme Court has reserved decision on the question of whether *Chimel* is to be retroactively applied, *see* Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969), and we are therefore relegated to the general criteria enunciated by the Court in determining the question of retroactivity. These criteria were stated in Stovall v. Denno, *supra*, 388 U.S. at 297, 87 S.Ct. at 1970, to be "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice by a retroactive application of the new standards." In Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), the Court applied these criteria in making wholly prospective its ruling in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1968), where the Court had applied the Fourth Amendment safeguards to electronic eavesdropping. In so doing, the Court elaborated on the criteria as follows: "Foremost among these factors is the purpose to be served by the new constitutional rule. *This criterion strongly supports prospectivity for a decision amplifying the evidentiary exclusionary rule.*" Desist v. United States, *supra*, 394 U.S. at 249, 89 S.Ct. at 1033. (Emphasis added). *See also* Fuller v. Alaska, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968); Linkletter v. Walker, 381 U.S. 618, 638–639, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

We fail to perceive any meaningful distinction between the purpose of the rule announced in *Katz* and made wholly prospective in *Desist,* and the purpose of the rule announced in *Chimel.* This analysis alone persuades us that *Chimel* should be applied wholly prospectively,

10. The Government argues that the seizure of the envelopes might be justified on the "plain view" theory, *see* Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); United States v. Thweatt, 140 U.S.App.D.C. ——, 433 F.2d 1226 (decided June 30, 1970), or, in the alternative, that a remand could be made to resolve the inconsistency. Our disposi-

tion of this issue makes consideration of these arguments unnecessary.

11. *See, e. g.,* United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

and a consideration of the other two criteria only reinforces this conclusion.

It would be difficult to estimate the number of convictions based at least in part on evidence which would now be considered inadmissible under *Chimel;* suffice it to say that the number would be quite substantial and the administration of justice consequently impaired. *Cf.* Desist v. United States, *supra,* 394 U.S. at 251, 89 S.Ct. 1030. And even if the holding in Chimel may have been foreshadowed, *see* Chimel v. California, *supra,* 395 U.S. at 768, 89 S.Ct. at 2042, it was nevertheless "a clear break with the past," [12] and thus it cannot be said that law enforcement officials were unjustified in relying on the existing law as clearly stated previously by the Supreme Court in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 439, 94 L.Ed. 653 (1950) and Harris v. United States, *supra.*

We note that this conclusion has been reached in several other circuits. *See* Williams v. United States, 418 F.2d 159 (9th Cir. 1969), cert. granted, 397 U.S. 986, 90 S.Ct. 1120, 25 L.Ed.2d 394 (March 24, 1970); Whitely v. Meachum, 416 F.2d 36, 41 (10th Cir. 1969); Lyon v. United States, 416 F.2d 91 (5th Cir. 1969), cert. denied, 396 U.S. 1023, 90 S. Ct. 597, 24 L.Ed.2d 516 (1970); United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969). Certain state courts have reached or assumed the opposite result. *See* Fresneda v. State, 458 P.2d 134, 143 (Alaska 1969); State v. Ashby, 228 So. 2d 400, 404 (Fla.App.1969); State v. Cullison, 173 N.W.2d 533, 540 (Iowa 1969); State v. Rhodes, 80 N.M. 729, 460 P.2d 259 (1969); contra People v. Edwards, 80 Cal.Rptr. 633, 458 P.2d 713,

720–721 (1969). We believe that the rule announced by the various federal circuits, which are unanimous, represents the better view.

### No. 22210—*Sutton v. United States*

### I

Appellant Sutton first contends that his removal proceeding was improperly conducted in that he was not advised of his rights as required by Rule 40(b),[13] and that consequently his cellblock lineup that was held upon his return to the District of Columbia occurred during a period of "unnecessary delay" under Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

 As a basis for this argument, Sutton contends that there is no record evidence that he was informed of his rights at his removal hearing. However, the record is not as silent as Sutton contends. The United States Commissioner for the District of New Jersey recorded on the removal papers, "Removal hearing held * * *." Since under Rule 40(b) an integral part of a removal hearing is informing the defendant of his rights,[14] the notation by the Commissioner that a removal hearing was held is a shorthand method of stating that the formal requirements of the Rule for a removal hearing have been satisfied, in the absence of any evidence to the contrary. Thus the record before us fairly indicates that he was advised of his rights.

 But even if the removal hearing were defective, and even if this resulted in an "unnecessary delay," *Mallory* would not require suppression of the in-court testimony concerning appellant's cell-

---

12. Desist v. United States, 394 U.S. 244, 248, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

13. Fed.R.Crim.P. 40(b)(2) provides:
 *Statement by Commissioner or Judge.* The commissioner or judge shall inform the defendant of the charge against him, of his right to retain counsel, of his right to request the assignment of counsel if he is unable to obtain counsel, and of his right to have a hearing or to

waive a hearing by signing a waiver before the commissioner or judge. The commissioner or judge shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him, shall allow him reasonable opportunity to consult counsel and shall admit him to bail as provided in these rules.

14. *See* note 13 *supra.*

block identification. In Williams v. United States, 136 U.S.App.D.C. 158, 419 F. 2d 740 (1969), this court, sitting *en banc,* held that the suppression rule of *Mallory* did not apply to confrontations occurring before the decision in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Although the question of *Mallory's* applicability to post-*Wade* confrontations was reserved,[15] this court did state at 136 U.S.App.D.C. 162, 419 F.2d at 743–744:

> If the lineup or other identification procedure is made in the presence of counsel for the suspect, there would be no basis for a claim the identification was excludable as a fruit of illegal delay in presentment.

In the case at bar, appellant was represented at his cellblock lineup by two "substitute" counsel from the local Legal Aid Agency.[16] Therefore his claim that *Mallory* requires the suppression of evidence concerning this lineup is without merit.

## II

Appellant Sutton next argues that the trial court erred in refusing to instruct the jury that the pay envelopes recovered in appellant Bigsby's apartment were introduced only against Bigsby and were not relevant on the question of Sutton's guilt.

■ It was not error for the court to refuse this instruction. The evidence that the pay envelopes were found in Bigsby's apartment is corroborative of the occurrence of the robbery and of Bigsby's participation therein. And evidence that Bigsby participated in the robbery was also circumstantial evidence against Sutton. This is so because the Government introduced evidence that

two men jointly participated in the robbery, *i.e.,* that the two adjacent rooms in the motel were entered at the same time, that a second man joined the first man in the auditor's office at about the time that the man who had entered the sales office had left there and that the two men left the motel at about the same time. Thus the case against Sutton may properly have been enhanced in the jury's mind by evidence tending to show the participation of Bigsby as the second man, and that was the proper evidentiary function served here by the pay envelopes.

We note that the prosecutor, in his closing argument to the jury, summarized the evidence against Bigsby as being the identifications plus the payroll envelopes, whereas against Sutton he stated: "The case against defendant Sutton is the same case except no physical evidence. The only evidence against Sutton is identification of two witnesses." In other words, both the court and the prosecutor recognized that the payroll envelopes were not direct evidence against Sutton, but that they rather were only circumstantial evidence in that they tended to establish a second man's participation in the robbery. The court, in refusing the requested instruction, left it to the jury under the general instructions to draw whatever inferences, if any, that it considered proper, and we are of the opinion that this was correct.

## III

■ Appellant Sutton finally argues that the trial court erred in sentencing him to consecutive terms of imprisonment for robbery and assault with a dangerous weapon. This precise question has not yet been decided by this court.

15. Appellant Sutton's identification took place on September 21, 1967, approximately three months after the decision in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

16. Appellant does not allege a violation of his right to counsel under United States v. Wade, *supra,* and it may be doubtful whether he could in light of our recent decision in United States v. Kirby, 138

U.S.App.D.C. 340, 427 F.2d 610 (decided April 24, 1970), wherein we held that the use of "substitute" counsel could satisfy the requirements of *Wade* in a proper case. Nor does appellant allege a violation of due process under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In fact, there is no allegation that the cellblock lineup was unfair in any way.

The late Judge Holtzoff in a District Court case, United States v. Bauer, 198 F.Supp. 753 (D.D.C.1961), upheld consecutive sentences for robbery and assault with a dangerous weapon; on the other hand, there is a dictum in Jackson v. United States, 134 U.S.App.D.C. 18, 23–24, 412 F.2d 149, 154–155 (1969), which raises some doubts about such sentencing. However, we do not reach this question here for the same reason we did not reach it in *Jackson*.

Sutton was adjudged guilty on Count I of robbery from the person and immediate actual possession of Jean A. Marshall of property of Executive House Restaurants consisting of $6,600 in money and was sentenced to a term of not less than five years nor more than fifteen years' imprisonment. He was also adjudged guilty on five counts of assaulting five individuals (including Marshall) with a dangerous weapon (a pistol) and on each of such five counts he was sentenced to a term of not less than two years nor more than six years' imprisonment. The terms of the five sentences imposed on Counts II through VI for assault with a dangerous weapon were ordered to run concurrently with each other and consecutively with the terms imposed on Count I for robbery. Only one of the assault charges related to Jean Marshall who was the sole victim designated in the robbery count. The other four persons who were charged with having been assaulted by both Sutton and Bigsby were Palmer, McNaughton, Heher and Birney, and it should be remembered that Heher and Birney were never in the auditor's office where Marshall was robbed of the money.

Under such circumstances, the argument that consecutive sentences were improper would go only to the robbery of and assault upon Jean Marshall, and would not affect the assaults by Sutton with a dangerous weapon upon the other four persons, two of whom were placed in the closet of the sales office by Sutton while Bigsby was robbing Marshall in the auditor's office. The assaults on the four individuals (Marshall excluded) were clearly separate offenses from the robbery of Marshall for which the statute provided separate punishment.[17] So we find no infirmity in the convictions on the four assault charges and since Sutton was previously convicted of another felony and has four other convictions here of unlawful assaults, in addition to the present robbery conviction, it does not appear that the conviction for his assault upon Marshall would have any prej-

17. In 1901 when Congress enacted what appeared at the time of this offense as § 502 and § 2901 of the D.C.Code, it included "assault with a dangerous weapon" in that section (§ 804) of the Act which prohibited assaults with intent to commit *mayhem*, and the juxtaposition of the statute indicated an intent to treat such crimes as lesser included offenses of murder and other crimes involving physical injury of the person. (31 Stat. 1321). Thus § 798 defined murder in the first degree, § 799, murder in first degree by obstructing railroad; § 800, murder in second degree; § 801, punishment for §§ 799, 800, 801; § 802, manslaughter; § 803, assault with intent to kill, and so forth; § 804, mayhem, *i. e.*, assault with intent to commit mayhem, and assault with a dangerous weapon; § 805, assault with intent to commit any other offense; § 806, assault in a menacing manner (31 Stat. 1321–1322). Congress was thus going right down the scale from murder to assault in a menacing manner, with each enumerated offense involving a lesser degree of the next previously stated offense. Congress never reached robbery in the subchapter of crimes until § 810 following rape and procuring miscarriage. Thus, the format of the statute relates assault with a dangerous weapon more to murder, manslaughter, etc., than to robbery. And the language of the statute indicates that each single act in violation of the statute constitutes the unit of prosecution. Thus § 804 states "*Every* person * * * convicted * * * shall be sentenced" (emphasis added) and § 810 provides "*Whoever* by force or violence * * * shall suffer imprisonment. * * * *"* (emphasis added). Nothing in the language of the statutes indicates a congressional intent to exclude convicted robbers from being sentenced for their assaults with a dangerous weapon, or relates the crime of assault with a dangerous weapon to the crime of robbery or creates any ambiguity on the subject.

udicial collateral consequences in the future. *See* Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

We note in passing that the crimes of robbery and assault with a dangerous weapon each contain a mutually exclusive element, *i.e.*, although the assault is common to both crimes, the robbery requires proof of a taking of property and the assault with a dangerous weapon requires proof of the use of a dangerous weapon. Although these different elements may or may not be sufficient in themselves to justify consecutive punishments when committed upon the same person,[18] the resolution of this question in the future takes on an added dimension in light of the fact that Congress has created for the District of Columbia a separate crime of armed robbery since the robbery in this case took place. This was done on December 27, 1967 by amending D.C.Code § 22–3201 to include robbery as one of those crimes of violence which may be punished more severely when committed with a dangerous weapon. *See* D.C.Code § 22–3201 (Supp. III, 1970); Act of December 27, 1967, Pub. L. No. 90–226, sec. 501, title V, 81 Stat. 736. This amendment may indicate a congressional intent that one who robs while armed with a dangerous weapon is to be punished in accordance with the provisions of section 22–3202, which now authorizes an indeterminate sentence up to life for crimes of violence when committed with a dangerous weapon. *See* D.C.Code § 22–3202 (Supp. III, 1970). Additional support for sentencing such offenders under the armed robbery statutes may be taken from the fact that D.C.Code § 24–203(b) provides for a minimum mandatory sentence of two years for a conviction of armed robbery in violation of section 22–3202 if such person had previously been convicted of a crime of violence. In other words, Congress has now provided a specific means for additionally punishing a person who uses a dangerous weapon in the commission of a robbery. A serious question is thereby raised as to whether Congress would intend that additional punishment for the same crime be extracted by other means such as consecutive sentences for robbery and assault with a dangerous weapon. Thus, one effect of the 1967 amendment may have been to create assault with a dangerous weapon as a lesser included offense of armed robbery, but this case does not provide a proper vehicle for the determination of that issue.

18. The Government argues on this appeal that the separate elements in the two crimes authorized the consecutive punishment, citing Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and Gore v. United States, 357 U.S. 386, 391, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). However, analysis of these and other cases make it clear that the fact that the crimes in question each contain a separate element does not, in itself, justify consecutive sentences. It has been recognized that the intent of Congress is controlling. *See, e. g.*, Callanan v. United States, 364 U.S. 587, 81 S.Ct. 321, 5 L. Ed.2d 312 (1961); Heflin v. United States, 358 U.S. 415, 79 S.Ct. 451, 3 L. Ed.2d 407 (1959); Ladner v. United States, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed. 2d 199 (1958); Gore v. United States, *supra*; Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957); Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955); Blockburger v. United States, *supra*; Morgan v. Devine, 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153 (1915). Whether or not Congress intended robbery of a person and assault upon the same person with a dangerous weapon to be consecutively punished when committed in the course of a single robbery is the question which we do not decide. *See* note 17 *supra* as to assaults with a dangerous weapon committed on bystanders during the course of the robbery. For an analysis of this problem with respect to other crimes, *see* Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432 (1967) (consecutive sentences for housebreaking and robbery upheld); Ingram v. United States, 122 U.S. App.D.C. 334, 353 F.2d 872 (1965) (consecutive sentences for assault with intent to kill and assault with a dangerous weapon held improper); Davenport v. United States, 122 U.S.App.D.C. 344, 353 F.2d 882 (1965) (consecutive sentences for aggravated assault and manslaughter held improper).

In passing, we remark that we do not question the right of the Government in robbery cases to charge assaults against bystanders who are not robbed as separate assaults, nor do we question its right to charge lesser include or alternate offenses to armed robbery in order to allow for contingencies in proof. We recognize that the Government may decline to charge armed robbery under section 3202 and may instead rely on the older formulation of robbery and assault with a dangerous weapon. We suggest only the possibility that if additional punishment is to be meted out for the use of a dangerous weapon, consecutive sentences for robbery and assault with a dangerous weapon may be an inappropriate means to accomplish that result and a more impregnable sentence may result if the offense is charged and sentenced under sections 3201 and 3202, as amended.

Affirmed.